LEONARD H. WICKLINE

*v.*

MONONGAHELA POWER COMPANY

(No. 10594)

Submitted January 26, 1954.      Decided April 2, 1954.

*Ezra E. Hamstead, Ernest R. Bell,* for plaintiff in error.

*William Corbly Lemley, Minter L. Wilson,* for defendant in error.

BROWNING, JUDGE:

This action of trespass on the case was instituted by Leonard H. Wickline in the Circuit Court of Monongalia County to recover the value of his house and household furnishings, which were destroyed by fire on the night of July 22-23, 1951. The declaration alleges the fire to have been caused by the negligence of the defendant power company's employees in disconnecting and reconnecting electric service to the plaintiff's house on July 20, 1951. Trial of the case lasted several days, a voluminous record was made, and, at the conclusion thereof, the jury returned a verdict in favor of the plaintiff in the amount of $1,250.00. A motion to set aside the verdict and award a new trial being overruled by the court, judgment was entered thereon on December 19, 1952, to which this Court granted a writ of error on June 1, 1953.

Defendant makes several assignments of error dealing with the giving and refusing of instructions and other matters; however, it will be unnecessary to consider these unless it is first determined that there is sufficient evidence to support the verdict.

The physical situation as it existed on July 22, 1951, the afternoon before the fire, may be described as follows: The defendant power company, in extending service to the plaintiff, ran three separate wires, two of which carried 110 volts each, and one of which was a neutral or ground wire, from a pole on which a transformer had been placed, to another pole, and thence to the upper part of plaintiff's house where they were attached by porcelain insulators; the three wires were connected to an entrance service cable which led down to the meter box, wherein the meter was housed, and hooked to the meter; and an entrance service cable then ran from the meter, through the wall of plaintiff's house and into his basement to connect with a panel range or fuse box. Wires running from the fuse box extended throughout plaintiff's house to all places where electricity was used. The evidence shows that from the point where the defendant's wires attached to the insulators on plaintiff's house, the plaintiff installed

and owned all electrical equipment, including the meter box, fuse box and all wiring extending from that point into and through the house, except the meter which was the property of the defendant. It is necessary to relate in as concise form as possible the facts as they were developed during an eight day trial, and comprising almost a thousand pages of testimony, in passing upon the defendant's principal assignment of error that the verdict is not supported by the evidence.

In May, 1948, the plaintiff informed the defendant that he was constructing a dwelling house at Cheat Neck in Monongalia County, approximately eight miles from the City of Morgantown, and that he desired electrical service therefor. There was some delay, because of prior applications and the necessity of acquiring certain rights of way, in furnishing such service to the plaintiff, and complaint was made by the latter to the Public Service Commission, who took no action in the case after an investigation, but service was furnished to plaintiff's house on June 23, 1948. From that time until July 20, 1951, the defendant's evidence shows that the plaintiff was delinquent in the payment of his electric bill twenty-two times, and that he was, on each occasion, informed of such delinquency. The plaintiff denies receiving formal notice of delinquency at any time, although he does not deny that he was late in paying his bill on many occasions. The plaintiff being delinquent in the payment of his bill for the months of May and June, 1951, was informed that the electric service to his home would be discontinued after July 12, 1951, and payment not having been made as of the morning of July 20, Ralph Rader, a collector of delinquent bills for the defendant, was directed to go to the plaintiff's home and either collect the amount due, or disconnect the electric service. Rader arrived at the Wickline home about 1:30 o'clock in the afternoon, after making other calls in the course of his employment earlier in the day, and there is a sharp conflict in testimony between him and Mrs. Wickline as to what occurred at the Wickline home after his arrival.

Rader says he talked to Mrs. Wickline from her back porch, and not receiving payment for the past due bill, proceeded to the meter box, which he states was securely fastened to an outside wall of the house by four bolts, disconnected the electricity at the meter, and immediately left the vicinity. Rader states that he had been employed by the defendant company for about thirty years, and had had twenty years experience in manipulating the mechanism of a meter box, and in connecting and disconnecting meters. Mrs. Wickline says that when Rader came to her home she informed him that her husband had paid the electric bill earlier in the day, asked him to call the office of the defendant to confirm that fact, and not to disconnect the electricity. She says that Rader refused to do so, and proceeded, not to the meter box, but to the basement of her home to cut off the electricity. Rader denies that there was any conversation about the bill having been paid, or that he was in the Wickline home, or in the basement thereof, at any time that day. It is undisputed that at some time on that day, plaintiff appeared at the office of the defendant in Morgantown and paid his delinquent bill in the approximate sum of $17.00.

Mrs. Bernadette Nagy states that around 1:30 or 2:00 o'clock, Mrs. Wickline came to her home, the two houses being close together, and requested that Mr. Nagy convey a message to the plaintiff. The plaintiff testifies that the bill was paid prior to 1:30 o'clock, the approximate time the electricity was cut off. About 4:00 o'clock on this same afternoon, the plaintiff appeared at the Morgantown office of the defendant company, demanded that the electric service to his home be reconnected, inasmuch as the delinquent bill had been paid, and displayed a "counter receipt" as proof of his statement. Pursuant to this request, the credit manager of the defendant directed Everett G. Griffin, who had been employed by the defendant for a period of seven years, and who stated that he was familiar with meter boxes and the process of connecting and disconnecting electrical current at meter boxes, to proceed to the Wickline home and reconnect the

electricity. Griffin's work was finished for the day, and taking his wife and a friend of the latter, Jean DiPalo, with him in his jeep on an errand for which he would receive "time and a half pay", proceeded to the Wickline home. All three of these witnesses stated that the jeep was parked forty or fity feet from the Wickline home, and that Griffin went immediately to the meter box. Griffin states that he found the top portion of the meter box loose and leaning from the wall a distance of three or four inches, and that upon opening the meter box, he discovered that the meter was not disconnected, and electricity was flowing from it into the house. He stated that he closed the meter box, went to the back door of the Wickline home where he inquired of Mrs. Wickline whether she had electric service, and, being answered in the negative, he and she went to the basement where an examination was made of the fuse box. Griffin stated that the fuses were upside down, and that upon his reversing their positions, the lights came on in the basement, and upon inquiry, Mrs. Wickline informed him that the electricity was satisfactorily restored. He testified that he then proceeded to the jeep and left with his two female companions. Mrs. Griffin and Mrs. DiPalo confirmed all that Griffin stated with reference to his activities at the Wickline home, with the exception of what transpired in the basement where he was out of their sight and hearing.

Plaintiff's witnesses related an entirely different story as to Griffin's activities. Contrary to the testimony of the three witnesses for the defendant, that Mrs. Wickline was the only person present at that time at the Wickline home, Mrs. Wickline, her sister, Georgia Tenney, John W. McKinney, and his wife, Thelma McKinney, stated that all four were present and observed the activities of Griffin from the time of his arrival. Georgia Tenney, John McKinney and Thelma McKinney stated that they arrived at the Wickline home in an automobile about the time that Griffin arrived. These witnesses for the plaintiff stated that Griffin went to the meter box, attempted to open it, and, apparently being angry, beat on it with his fists, and

finally, placing one foot against the side of the house, pulled at the lid of the meter box until it was forcibly removed; that the lid went over Griffin's head and fell to the ground; and that Griffin also almost fell from the exertion. They stated that this action completely removed the meter box from the wall, left it dangling at the end of the wires, and broke the ground wire connected to the meter box and an iron peg in the earth beneath it. They further stated that Griffin commanded, in an angry tone, that Mrs. Wickline secure a "stick" for the purpose of supporting the meter box, which was supplied and placed under it. These witnesses also stated that Griffin appeared to be in a hurry, and that the two women in the jeep, on more than one occasion, called to him to "hurry up". Mrs. Wickline and Georgia Tenney stated that they then accompanied Griffin to the basement where he made some adjustment to the fuse box, whereupon the lights came on dimly. The plaintiff, his wife and several other witnesses stated that from the time Griffin left, about 5:30 or 6:00 o'clock on Friday evening the 20th, until Sunday night the 22nd, the lights burned dimly in the Wickline home; that the radio and television would not operate; and that the electric stove could not be used, and when turned on produced a "humming sound". The Wicklines stated that, being unable to prepare meals for themselves and their infant child, they did their cooking at the Nagy home nearby, but both Mr. and Mrs. Nagy testified to the contrary. Other witnesses, friends of the Wicklines, who were visiting them on Sunday, testified as to the condition of the meter box and the partial loss of electric current on that day.

Plaintiff also testified that on Saturday morning around 11:00 o'clock, he called the defendant's office and asked to speak to a Miss South. Upon being informed that she was not in, he asked for and was connected with the service department, and informed them of the condition of the meter box. A witness for the defendant, Janice Doubles, testified that she operated the telephone switchboard for defendant on Saturdays from 8:00 A. M. until 5:00 P. M.; that she had no help; that she was not away

from the phone that day; that she did not receive a call from plaintiff; and that, if any such call had been received, she would have made a report on it.

The plaintiff states that he was awakened about 12:30 A. M. on the morning of July 23 by the crying of his baby, and discovered that the house was full of smoke. He stated that he took his wife and baby to the Nagy home, and after Nagy dressed, the two men returned to the Wickline home. Upon opening the basement door, they found a fire burning in the vicinity of the fuse box. Nagy, being unsuccessful in attaching some hose, which he secured at his residence, proceeded to the home of another neighbor, approximately a quarter of a mile away, to secure help. Nagy states that while at that place, it occurred to him that a call should be made to the fire department, and, remembering that the only telephone in the vicinity was in the Wickline home, returned thereto, and called the Westover fire department. Members of that department promptly responded, but arrived too late to prevent the total destruction of the house and its contents, with the exception of the television set and some articles of furniture belonging to the child which were removed.

Two service employees of the defendant stated that they examined the meter box at the Wickline property on Monday morning after the fire; that the lid was firmly in place; that the ground wire extending from the meter box to the metal peg thereunder was intact; and that they removed the meter from the meter box. They say there was no tar or other substance on the meter box or inside of it at that time, although plaintiff's witnesses testified to the contrary, and such substance appeared on the meter box when introduced at the trial by the plaintiff. No such substances were on the meter when it was likewise produced as an exhibit by the defendant.

J. E. Landis, an adjuster for the company with which the plaintiff had insurance coverage, testified that on the day after the fire, settlement was made with the plaintiff in the sum of $3,500.00 for the house, and $1,616.00 for the

personal property, all of which was satisfactory to the plaintiff. At the trial, the plaintiff fixed the value of the house at $7,500.00 or $8,000.00, and the personal property, after depreciation, at $5,500.00.

The burden was upon the plaintiff to show, by a preponderance of the evidence, not only that the fire which destroyed his house originated from the electrical equipment or wires which were in or on it, but that the fire was attributable to the negligent acts of Rader or Griffin, or both, inasmuch as the meter box, fuse box and wires were the property of the plaintiff, and it was his responsibility for their being in proper condition. It was not enough for the plaintiff to show that one or more of the defendant's agents was negligent, and that a fire occurred which destroyed his house. He was required to go further and show, by a preponderance of the evidence, not only that there was some relationship between those events, but that the fire was the proximate result of the negligent acts. In attempting to carry that burden, the plaintiff relied principally upon the testimony of two electricians, Eugene Sych and E. Ralph Clear.

The plaintiff, while on the witness stand, stated: "* * * I told him there was some thunder and lightning, but I didn't know what caused the fire. And I yet do not know what caused the fire. I know where it started." Sych, who had wired plaintiff's house sometime between 1948 and 1951, when two additional rooms were added to it, and who had also moved the fuse box from the first floor to the basement, stated that he observed the meter box on Sunday, July 22, and that it was in a hazardous condition. No explanation is made as to why the plaintiff, a friend of the witness, as well as having employed him to change the position of his fuse box and wire a portion of his house, upon being informed by the witness that the condition of the meter box was hazardous, did not request the witness to do something to minimize the danger, inasmuch as plaintiff contends that his supply of electricity was so weak as to be valueless to him. Plaintiff merely states that the witness did not cause the

condition. When asked if he could tell from examining the meter box and the wires attached thereto, what caused the house to burn, Sych answered: "I am afraid I would have to say no." He further stated that he could not tell from the condition of the wires attached to the meter box whether they were burned by a short circuit, or from the fire which burned the house. However, upon being recalled, he stated, upon direct examination, that although a "short" in the wiring at any point between the fuse box and defendant's transformer would blow a fuse at the transformer, if a "partial short" occurred in the fuse box, it would create heat "and will not draw enough amperage, unless it is a real good short, to blow a fuse on the customer side." He further stated that such a "partial short" could create a "hot spot" without blowing a fuse, and could build up sufficient heat to start a fire. However, upon cross-examination, these questions were asked, and the witness made these answers: Q: "And you can't tell from examination of these wires that the fire was started by an electric short, or partial electric short either, can you?" A: "Right off hand, no, sir." Q: "The only thing you could offer would be a guess, wouldn't it?" A: "That's right."

E. Ralph Clear, a witness for the plaintiff, testified that if a short had occurred in the fuse box, it would carry back to the fuse in the transformer if the ground wire was not connected. He later stated that if the short occurred in the meter box, it would, in most cases, go back to the transformer, but in some cases, it might go the other way, into the fuse box; that you cannot definitely determine the direction in which it will go. He also stated that he did not know of his own knowledge what caused the fire. On recall, he stated that there was no such thing as a "partial short", but that a partial ground could build up heat in a wire sufficient to cause a fire without developing enough resistance to blow a fuse either at the transformer or the fuse box. This witness was permitted to state, over objection, in answer to a question by counsel for plaintiff, that if sufficient force were applied to the meter box on the outside of the house, it would have a tendency

to pull the connections loose from the fuse box inside which could cause a ground or a partial ground in the fuse box. He further stated that such a partial ground might in turn, if left on long enough, "cause heat to heat wires, set wires afire, and in turn set anything afire that was close to it, or against it." Clear testified further that he could not state whether the cable at the fuse box end was destroyed by fire or a ground, inasmuch as the fuse box, and all but approximately three feet of cable attached to the meter box were destroyed by the fire. The witness stated, upon cross-examination, that he did not know what caused the insulation to be burned off of the electric cable leading from the meter box to the fuse box, a distance of three or four feet. He stated: "No one can tell whether that is an electrical burn, or from a fire that started otherwise." This further question was asked, and he made this answer: Q: "And there is no evidence by which that fact can be detemined, is there?" A: "No way possible." Clear further stated that from an examination of Exhibits 2-A and 2-B, they being the meter box with the wires attached thereto, and the meter lid, he could not tell what caused the fire in the Wickline home. He said: "As far as I am concerned, it is a guess."

The defendant arranged in the courtroom an exhibit, purporting to represent the electrical equipment and wiring at the Wickline home at the time of the fire. This demonstration showed that if the meter box containing the meter was immersed in water, the electricity would continue to flow in a normal manner; that if the lid was off of the meter box and some foreign object was blown or thrown therein causing a short circuit in the meter box, the short circuit would not travel to the fuse box, but the fuse would be blown at the transformer; and that if a short circuit occurred in the fuse box, it would not cause a fire, but would also blow the fuse at the transformer. Demonstrations to this effect were presented in the presence of the jury. The defendant's expert witnesses testified that the wires attached to the meter box had been burned, not by a short circuit, but by the fire which destroyed the house. One of the expert witnesses

for the defendant, when asked if there could be a partial short in any of the equipment that had been demonstrated to the jury, answered: "There is no such thing as a partial short."  .

In *Moore* v. *Heat & Light Company,* 65 W. Va. 552, 64 S. E. 721, this Court said: "Mere *tendency* to prove will not shift the burden. If the evidence 'in reference to a fact is equally balanced, or it does not generate a rational belief of the existence of the fact, leaving the mind in a state of doubt and uncertainty, the party affirming its existence must fail for want of proof.' " This Court is cognizant of the strong position of a party who comes here with a verdict approved by the trial court, but the evidence relied upon to sustain such verdict must be credible. A determination of the rights of litigants upon disputed and conflicting testimony is, of course, for the jury, and a verdict should not be disturbed if it is supported by credible evidence, or by reasonable inferences which may be drawn from such evidence. However, where the verdict of a jury, and judgment of a court are contrary to the law and evidence, an appellate court has the same duty to set aside the verdict and reverse the judgment, as it has to uphold a verdict and judgment, where there is sufficient evidence to support it.

In *Deluz, et al.* v. *Board,* 135 W. Va. 806, 65 S. E. 2d. 287, the only syllabus point says: "Where in a trial of an action at law before a jury, the verdict returned is without evidence to support it, or is plainly wrong, it will be set aside by this Court, the judgment entered thereon reversed, and the case remanded for a new trial." To the same effect is *Stenger* v. *Hope Natural Gas Company,* 139 W. Va. 549, 80 S. E. 2d. 889, decided March 23, 1954.

The plaintiff's evidence, standing alone shows only that one of defendant's agents was negligent in not properly handling the meter box of plaintiff, which was attached to his house, and that three days thereafter, the house was destroyed by fire. There is no evidence to support the allegation that another of defendant's agents negligently tampered with the fuse box. As hereinbe-

fore stated, the wife of the plaintiff testified that Rader, in disconnecting the electricity, went into the basement and tampered with the fuse box. Griffin, in restoring the electricity, merely changed the position of the "fuses", after finding them upside down. There is no testimony by any of the expert witnesses that such "tampering" would create a hazardous condition, and an examination of the fuse box, or one similar thereto, reveals that it is a very simple and uncomplicated matter to reverse the "fuses" and disconnect or reconnect the electricity. It is also apparent that the entrance service cable attached thereto, of necessity, could not have been in direct contact with any wood for a distance of three or four inches from the box, inasmuch as the hole through which it entered the box was approximately two inches from the back thereof. The record does not show whether the fire originated from lightning, there being a storm in progress just prior to the fire; whether a short circuit developed in the meter box, or in the fuse box, which was insufficient to blow a fuse, and thereafter generated heat which burned a wire, which, in turn, set on fire a portion of the house; or from some other cause. Nor was evidence produced from which the jury was justified in drawing inferences that the fire was caused by any act of defendant's agents. From the evidence presented herein, the jury arrived at a conclusion which, though consistent with the theory of the plaintiff, was not deducible as a reasonable inference from the facts presented. An inference rests upon premises of fact; mere conjecture and surmise do not.

Furthermore, negligence, to be actionable, must be the proximate cause of the injury complained of, and must be such as might have been reasonably expected to produce an injury. This Court in *Stenger* v. *Hope Natural Gas Company, supra,* said: "Moreover, if we assume that any of such acts, or all of them combined, established negligence on the part of defendant, yet the proof would not support the verdict for the reason it is not established that the damages or the explosion necessarily or probably resulted from such negligence." It was reversible

error for the trial court to refuse to give the peremptory instruction offered by the defendant at the conclusion of all of the evidence.

In view of the holding of the Court that the verdict is not supported by the evidence, it is unnecessary to discuss the other assignments of error. The judgment of the Circuit Court of Monongalia County is reversed, the verdict of the jury set aside, and the case is remanded for a new trial.

*Reversed; verdict set aside; remanded for a new trial.*

GIVEN, PRESIDENT, dissenting:

As I understand and view the evidence, the question of negligence of defendant was definitely one for jury determination. It is well settled that questions as to credibility of witnesses, and the weight to be given their testimony, are peculiarly for jury determination. It is also well settled that where the evidence is in conflict courts should not attempt to substitute their findings for those of juries. In passing upon the sufficiency of evidence to support a verdict, a court should consider the evidence in the light most favorable to the finding of the jury, and evidence conflicting with the finding, unless clearly overwhelming, should be disregarded. To cite authorities as to these principles would be presumptive.

About eleven o'clock on the morning of Friday, July 20, 1951, plaintiff appeared at the office of defendant and paid his delinquent electric service charge. About one thirty o'clock of that day an employee of defendant proceeded to the home of plaintiff with instructions to either collect the amount of the delinquency or disconnect the service. On appearing at the home, the employee was informed by the wife of plaintiff that her husband had advised her by telephone that the delinquent bill had been paid, and requested that the employee verify the fact of payment

by use of a telephone there available. The employee refused to do so, but went into the basement of the home and disconnected the service. The wife informed plaintiff of that fact and he again went to the office of defendant, exhibited the receipt which had been given to him that morning showing the payment of the delinquent bill, and demanded restoration of the service.

According to testimony of the wife of plaintiff, another employee of defendant, Everett Griffin, late in the afternoon of the same day, appeared at the home for the purpose of reconnecting the service lines. He attempted to do so at the meter box outside of the dwelling, but had difficulty in removing the lid from the meter box, "* * * And then he got real mad, and even braced himself with his foot against the side of the house and pulled on it real hard; and I guess about that time the cap of the meter box flew off, and the meter box—the cap flew clear over his head, and he tumbled backwards. And after the meter box came loose from the house, the wire that comes from the meter box to the ground it came loose, and the meter box went clear up in the air and went clear up against the side of the house". The wife also testified that "This wire leading from the meter box down to the ground, that was fastened to the ground, it broke loose, it flew way up in the air." Not being able to restore the flow of the electric current at the meter box, the employee went into the basement, made certain adjustments at the panel switch, and a very small amount of electric current was made to flow over the service lines, but not sufficient to operate any of the electric appliances in the house, such as the refrigerator, range, television and radio. Griffin, after informing the wife that defendant would make necessary repairs on the following Monday, left the premises without having satisfactorily restored service, without having secured the meter box torn loose from the house and left suspended in the air, and without having reconnected the broken ground wire.

The testimony of the wife is corroborated by plaintiff

as to the insufficiency of the flow of electric current after Griffin had attempted to restore it, and as to the condition of the meter box, wires and the broken ground wire. Her testimony is fully corroborated by Georgia Tenney, who was present while Griffin was trying to restore the service. She testified that Griffin pulled the meter box from the wall, "* * * And the ground wire was pulled up out of the ground, and all these wires were torn loose, and the meter box was just hanging in the air swinging." The wife is also corroborated by John W. McKinney, who testified that he arrived at the Wickline home about the time Griffin arrived, and that the meter box was attached to the side of the house at the time Griffin arrived; that he saw Griffin pounding and pulling on the meter box, saw the meter box hanging in the air supported only by wires, and saw Griffin go into the basement of the Wickline home. The testimony of the wife of plaintiff is also corroborated in part by the testimony of Thelma McKinney and of Fern Davis, offered on rebuttal by plaintiff. Her testimony is also corroborated by the testimony of Eugene Sych, an experienced electrician, who saw the meter box on Sunday and testified: "By the lid, I mean this was off, and the meter was hanging approximately in that position —something like that—and had a stick under it; and the ground, which is this, was broken off of the ground, the wire was broken off the ground." He also testified to the effect that the condition created by the breaking of the ground wire and the meter box hanging by the wires constituted a "dangerous condition", and a "hazardous condition". Also, Ralph Clear, an electrical contractor engaged in such business for approximately thirty years, testified to the effect that the broken ground wire "definitely" created a "hazardous" condition. This witness further testified that "If there was sufficient force applied to the meter box on the outside of the house, it would have a tendency to pull the connections loose in the panel inside, which probably would cause a partial ground, or a ground on the panel inside the house"; and further, "If it was left on long enough, it would cause heat. It

would cause heat at any time; but if it was left on long enough it would cause heat to heat wires, set wires afire, and in turn set anything afire that was close to it, or against it." Some of the electric fixtures or wires concerning which the evidence related were exhibited to the jury. There is nothing in this evidence impossible of belief. The jury did believe it. While clear preponderance of evidence is not established by mere number of witnesses, the number of witnesses who testified on behalf of defendant concerning the foregoing facts did not exceed the number testifying as to the same facts on behalf of plaintiff.

I do not think it can be questioned that other evidence before the jury was clearly sufficient to support a finding to the effect that the only electric current entering plaintiff's home was furnished by defendant; that immediately before origin of the fire which destroyed plaintiff's dwelling no fire, not even a match, was in the basement of the dwelling; that nothing of a combustible nature was in the basement; that the fire which destroyed the dwelling originated in the basement at or near the panel switch; and that the manner in which defendant's employees handled the meter box, wires connected thereto, and the ground wire could have created a hazardous condition, in all probability a faulty or broken connection, which caused the fire. There is really no contradiction of the evidence of plaintiff and Frank Nagy to the effect that the fire originated at or near the panel or fuse box. Neither is it contended that prior to the time the service was disconnected by the employee of defendant the electric installations used in connection with the furnishing of the service were not operating satisfactorily, or that sufficient current was not being delivered to operate all electrical appliances in the home of plaintiff. While defendant attempted to cast doubt on the testimony of plaintiff's witness relating to the insufficiency of the electric current flowing to the service lines, between the time Griffin attempted to reconnect the service and the time of the fire, the question was undoubtedly one for jury determi-

nation. Other evidence, circumstances and inferences favorable to plaintiff's contentions could be detailed, but the facts recited appear sufficient.

The facts recited, I think, establish beyond any probable doubt the negligence of defendant. They exclude any probable cause of the origin of the fire other than such as could have occurred from broken or faulty connections resulting from defendant's negligence. I do not overlook the necessity of examining very closely evidence in cases similar to the instant one. Jury verdicts, of course, are not infallible. They should, however, be respected. No doubt exists in my mind that the evidence of plaintiff, if believed, was sufficient to support the verdict, and, as before noted, the credibility of the witnesses, and the weight to be given their testimony, were for the jury.

Being of the views indicated, I respectfully dissent. I am authorized to say that Judge Riley is of the views expressed herein. We would sustain the verdict and affirm the judgment of the trial court.