**KENTUCKY POWER COMPANY,**
Appellant,

v.

**G. C. DILLON et al., Appellees.**

Court of Appeals of Kentucky.

March 17, 1961.

Rehearing Denied May 12, 1961.

Willis W. Reeves, Maxwell P. Barret, Hazard, E. Gaines Davis, Jr., Frankfort, for appellant.

S. M. Ward, Hazard, for appellees.

STANLEY, Commissioner.

The appellees, Guy C. Dillon (also called "Doc" Dillon) and his wife, Mollie, sued the Kentucky Power Company to recover $11,381.85 as damages for the destruction of their residence and contents by fire. The basis of the action was negligence in installing and maintaining electrical wiring and equipment servicing the building. The plaintiffs recovered a judgment for $4,000.

The appellant insists there was no trustworthy evidence of negligence or cause, so that the verdict must be regarded as flagrantly against the evidence.

The plaintiffs lived in a four room box house on Bailey Branch of Massie's Creek in Perry County. The fire occurred shortly after noon on Sunday, December 28, 1958. Four years before the fire the company had extended service wires to the house from a transformer on a pole across a county road, a distance of about forty feet. The lines were attached to the side of the building and then run about ten feet around the corner with a drop to a meter and thence to a "switch box" on the porch. The defendant's undisputed evidence was that the installations were made and maintained in strict accord with safety codes and proper electrical engineering by the use of insulated wires, porcelain insulators and ground wiring. The appellees rely on the rule of res ipsa loquitur.

Mr. Dillon was not at home and arrived after the fire. We summarize Mrs. Dillon's testimony. She had gone to the well near the front porch and drawn a bucket of water and then saw a "blue looking blaze" on the side of the house where the electric wires were connected, and "it caught the house on fire." She described the blaze as "shooting" and "about the size of a water bucket." She did not say that electricity was jumping or arcing between the wires and the building. On redirect examination the witness testified that when she saw the fire there was a noise at the transformer on the pole across the road, which was "popping and cracking like a shotgun." She ran into the house and took her five young children out the back door. When she got out there the fire had gone through a window and into the front room. She did not try to get anything out of the house but the children. Anticipating the defense, Mrs. Dillon stated there was no fire in the house, although it was mid-

winter. She had "just put fine coal on the fire" in the grate. There were no diapers or other clothing hanging in front of the grate.

Bonnie Lou Dillon, ten years old, testified that when her mother got her out of the house the fire "was on them juice wires on the side of the house." In contradiction of her mother, the child stated there was a fire in the grate, but she sustained her in saying there was no clothing hanging around.

Isom Dillon and James F. Dillon, father and brother of the plaintiff, Guy Dillon, testified they came along the road while Mrs. Dillon was getting the children out of the house. Isom testified that the fire was on the corner of the house and "running up and down the wire over the road toward the post" and there was "popping and cracking between the post and the house." He stated that there was "smoke and stuff gathering around and fire flying, and I got the children off the porch." James Dillon testified that he heard a "racket, popping and cracking" on the post and with "fire flying from it." He saw fire on the side of the house coming "from the juice wires," and the meter on the house "busted, blowed all to pieces." (An exploding meter would indeed be a phenomenon.)

The inconsistencies of the testimony of the plaintiffs' witnesses are apparent.

As heretofore related, the defendant's witnesses described the installations and proved they were safe and in no way defective. A service man immediately after the fire found the wire across or along the road and cut it off at the transformer. The wire was exhibited at the trial and brought here. The insulation on it was in perfect condition and showed no evidence of burn or impairment. The fuse of the transformer had blown out, but there was nothing wrong with the apparatus, and it has continued in service. Electrical experts testified that the conditions described by the plaintiffs' witnesses could not have existed, and the fire could not have been caused by the wires or equipment. They testified there is nothing in a transformer that will pop or crack except during an electrical storm when the lightning arrester may leak off to the ground, as it was designed to do.

The defendant introduced a near neighbor, Mrs. Charlotta Hensley. She testified that she was in the house when it caught fire. We quote her description of the events.

"Well, I'll just tell how it was. They had a diaper—baby diaper, you all might laugh at me for calling it a baby diaper, but that's old fashion —hanging by the fire on a chair, and the young'uns was running and playing,—you know how young'uns will run and play—and they knocked the chair over in the grate, and Bonnie picked it up and carried it in her hands kindly like that (Witness demonstrating), and she acted like it burnt her, and she threwed it back in the corner, and it just took a light streak."

The witness stated the house was papered partly with newspapers, and the burning diaper "hit the paper and sot the paper a fire." Neither Isom or Frank Dillon was at the house, but the witness told her "old man," Roy Hensley, to notify them. Hensley went for them and they came when the house "was so nigh gone they didn't do nothing. They just stood there like the rest of us and watched it."

The witness denied there were any hard feelings between her and the Dillons, but the Dillons vigorously contradicted her and said she had never been in the house. It appears that she had been the cause of Dillon's being convicted of bootlegging. See Dillon v. Commonwealth, Ky., 328 S.W.2d 147.

Several witnesses testified that while the house was still burning, or shortly thereafter, Mrs. Dillon was sitting in a truck with her little baby and then and there

said to them or in their presence that the fire was caused by diapers before the grate catching fire. Whether there was ill will of some of these witnesses toward the Dillons was in sharp dispute. Two men testified that after the fire Guy Dillon had offered them $100 each if they would "swear the house was burned by the juice." Dillon vigorously denied their statements and stated that the witnesses were unfriendly to him.

Stated politely, the plaintiffs' evidence does not have the atmosphere of verisimilitude. The electric installation was the same as it had been for four years, and the plaintiffs admit there had been no trouble and no such phenomenon as they described on this occasion had ever previously occurred. The continuing absence of any indication of a defective condition is in accord with the undisputed evidence that a transformer of the kind used here cannot "pop and crack like a shotgun," or pop at all except during lightning, and there was no claim of a storm at that time, although there was a drizzling rain about the time the fire was discovered. It is in accord also with the evidence that the particular transformer was in good condition after the fire and has been continued in service. There was no evidence of any fault.

The jury might well believe that the testimony of Charlotta Hensley was not true. But it tests credulity to the breaking point to say that so many witnesses testified falsely that the plaintiff, Mrs. Dillon, at the scene of the fire stated that it had started from within the house, as Mrs. Hensley had testified. It is to be doubted that in the dead of winter there was no fire in the house to heat it.

If it be conceded that the plaintiffs' evidence brought the case within the res ipsa loquitur rule with respect to control, at most it established only the possibility that the phenomenon described caused the fire. That is not enough.

Kentucky Power Co. v. Hogg, Ky., 301 S.W.2d 1. We cannot, in good conscience, say that there was any evidence of probative value to show that the fire was caused by a defective or faulty condition of the defendant's wires and equipment. Kentucky Power Co. v. Howard, Ky., 296 S.W.2d 463; Kentucky Power Co. v. Combs, Ky., 305 S.W.2d 105.

We, of course, recognize that the weight of evidence is for the jury. But a concomitant recognition is that the evidence introduced to sustain an issue must be evidence "of substance and consequence, carrying the quality of proof and having fitness to produce conviction." Pioneer Coal Co. v. Lisenbee, 276 Ky. 308, 124 S.W.2d 94, 96; Lambert v. Miller's Adm'r, 277 Ky. 64, 125 S.W.2d 1019; American Rolling Mill v. Pack, 278 Ky. 175, 128 S.W.2d 187; Coney Island Co. v. Brown, 290 Ky. 750, 162 S.W.2d 785. If the evidence is not of that character, it must be said that a verdict based upon it is so flagrantly against the evidence as to indicate that the verdict was the result of passion or prejudice and to sustain it would cause the miscarriage of justice. Nugent v. Nugent's Ex'r, 281 Ky. 263, 265, 135 S.W.2d 877; Garrison v. United States, 4 Cir., 62 F.2d 41, quoted in § 4, Stanley's Instructions to Juries. In the present case it is implicit in the verdict that it was returned through sympathy for the plaintiffs for the loss of their home, and sympathy is a species of passion. Where a verdict would have to be set aside as being flagrantly against the evidence, the court should direct a verdict in accordance therewith. Wadkins' Adm'x v. Chesapeake & O. Ry. Co., Ky., 298 S.W. 2d 7.

The defendant made a motion for a directed verdict and also for a judgment notwithstanding the verdict. We are of the opinion that the judgment should be reversed and that a judgment should be entered for the defendant.