LOTTINGER, Judge.
This is a suit in tort by Kemra Lumber Company, Inc., against Louisiana Power & Light Company, et al. for damages resulting from a fire which totally destroyed the mill owned by petitioner. Damages are claimed in the amount of $50,377.20. T. P. Ladner, who was working for Louisiana Power & Light Company at the time of the fire, was joined as a party defendant, however, there was no effort made by petitioner to hold him personally liable. The Lower Court awarded judgment in favor of defendants and dismissed the petitioner’s action. The petitioner took a devolutive appeal to the Supreme Court, however, because of the recent change in jurisdiction, the appeal is now lodged with this Court.
The record reflects that sometime between 4:20 and 4:40 a. m. on April 3, 1956, the lumber mill owned and operated by petitioner at Amite, Louisiana, caught on fire and burned. The petitioner contends that the fire was caused by a short circuit in the main switch-box which was located on the side of petitioner’s mill. This short circuit was maintained for a lengthy period of time during which the building caught on fire as a result of the short circuit, and that the firemen were unable to direct streams of water on this portion of the building due to the “arcing” and “sparking” of the electric wires which lead from a transformer bank to the service pole of the defendant company. From this latter pole, the wires led to the main switch-box on the side of petitioner’s building, the switch-box being located in what was known as the filing room. Petitioner claims that the service pole was inadequate and improperly guyed, and that, due to a .strong wind which was blowing on the night of the fire, the pole swayed to such an extent as to cause the “arcing” and “sparking” along the electric wires which, in turn, caused the short circuit in the switch-box. The petitioner further contends that the transformer bank located a short distance from the mill was excessively fused, and that if it had been properly fused, the short circuit would have blown the fuses and cut off the current before it caused a fire.
Petitioner specifically alleges negligence on the part of defendant as follows:
1.
The said transformers were improperly and excessively fused.
2.
The feeder line from the transformer to the Kemra mill was not protected by fuses or any other type of protective devices between the said transformer and the switch-box at the Kem-ra mill.
3.
The service pole of the power company located near the Kemra mill was inadequate for the purposes for which it was used.
Petitioner further pleads the applicability of the doctrine of res ipsa loquitur for the reason that the cause of the short circuit and resulting fire were peculiarly within the knowledge of the defendant power company, and the electricity which caused *690 the fire was under the exclusive control and management of the defendant power company.
The defendant, on the other hand, claims that there was no negligence whatsoever on its part, and that the fire was caused by some hazard which existed within the confines of the petitioner’s lumber mill.
The record shows that the power company served electricity to Kemra by means of a “lateral” line leading from its main lines about one-half mile to the east of the Kemra mill to a point about 154 feet to the east of the mill where a “transformer bank” or “sub-station” was located. From the transformer bank, where the electricity was “stepped down” to the voltage required by the customer, three “conductors” or wires, sometimes referred to as “secondaries”, led across a canal and the mill yard to a service pole. The distance between the transformer bank and the service pole was approximately 154 feet. The wires were attached to the service pole by means of a spool bracket, sometimes referred to as a “secondary rack” and then the wires led for a distance of approximately 13 feet to another spool bracket attached to the side of the mill building. At this point, on the bracket attached to the mill building, the power company installation ended and connection was made by the Kemra electrical installations. From that point on, all electrical installations were owned, installed, maintained, controlled and managed by Kemra. These installations consisted of running the wires through a J^ths service entrance, down through a 3-inch service head to a 400 ampere fuse safety switch, then through a 3-inch conduit to another fuse disconnect switch, and then to a 200 h. p. motor with a starting compensator between the safety switch and the motor. Kemra also had a 440 volt transformer for lighting purposes. Part of these Kemra facilities were on the outside wall of the mill building, however, Kemra’s safety switch, main switch-box, compensator, and motor were all on the inside of the building. Also situated within the Kemra mill was a dry type transformer. This transformer was located in the filing room, within which was also located the main fuse box of Kem-ra. The filing room was on the southeast end of the mill building, and constituted the point of entry of the electrical current servicing the mill.
The testimony taken as a whole shows that there was a great amount of confusion among the spectators at this unfortunate fire. Petitioner introduced three lay witnesses who claim to have been eye witnesses to the beginning of the fire. In addition, one witness was introduced who testified he was present when the fire started, however his testimony was attacked, and a written statement signed by this witness was introduced to the effect that he was home in bed when the fire started.
The lay witnesses who claimed to be present during the early part of the fire testified to the effect that there was a great deal of “sparking” and “arcing” along the electric wires between the mill building and the service pole of the defendant company. Some of these witnesses testified that this condition existed for a period of approximately five minutes. They further testified that the service pole belonging to the defendant company was “swaying” and “vibrating” due to the high southeast wind which was blowing at the time.
One expert witness, Mr. James M. Todd, a qualified electrical and mechanical engineer was introduced on behalf of petitioner. He'testified that in his opinion some short circuit was maintained in the switch-box of the Kemra mill for a period of some ten or twelve minutes, which produced enough arcing and heat temperature within the switch-box as to start a fire in the mill building through that switch-box. It was his contention that this short circuit caused the “arcing” and “sparking” along the lines between the service pole and the mill building. Upon direct examination Mr. Todd testified that the service pole maintained by the defendant company was inadequate for *691 the purposes it^ served, however, after visiting the scene of the fire and assuring himself that the pole was properly guyed and the stub of same was still firmly imbedded in the ground, he admitted that the installation was adequate. Upon direct examination, Mr. Todd was furthermore of the opinion that the voltage of the transformer bank maintained by defendant was of a 22,000 volt rating. However on cross examination, when he was told that the rating was only 13,800 volts, he admitted that the fusing of the transformer bank was within proper limits. On cross examination, Mr. Todd finally admitted that “The damage which I have seen in the electrical apparatus could have been a short circuit resulting from the general collapse caused by a general fire, rather than by the short circuiting first”. Notwithstanding this admission, Mr. Todd, being a good witness for his side, still testified that he was of the personal opinion that the fire started in the electrical equipment. However his testimony indicates that the electrical equipment which caused the fire was the main meter box located within the mill building, and which was owned, serviced and maintained by the Kemra mill.
As stated above, one lay witness, a Mr. Davis E. Granger, introduced by petitioner, testified that he was present when the fire started. The evidence reflects that Mr. Granger was a night watchman employed by the petitioner, and he was on duty, or was supposed to be on duty during the night of the fire. He testified that he was about three feet from the fire when it started, and that he “first noticed the wiring on the post was firing and going into the mill into the box that set on the southeast corner of the mill, which led to the filing room”. He further stated that “the wires was bringing the sparks up and coming into the mill, and that set the outside of the southeast corner of the mill on fire”. This witness then testified that, “I got panicky and went home”.
Upon cross examination, counsel presented Mr. Granger with a signed statement which the witness denied was his statement. This statement, purportedly signed by Edwood Granger was to the effect that he was at home when the mill caught fire, and upon noticing the fire, ran all the way to the mill but was unable to get into the office because it was locked and was, therefore, unable to call the fire department. This statement was signed by Edwood Granger in the presence of two witnesses who testified to its authenticity, and his signature taken while he was on the witness stand appears to match that as contained on the statement.
Mr. Jeff C. Easley and Mr. Joe H. Bender, Jr., both testifying for defendant, and both members of the Amite Fire Department, testified that they were present when the statement was taken and signed by Granger. They testified that Granger told them that he was afraid the owners of the Kemra mill would fire him if they knew he was not on duty as night watchman, and that is the reason they gave for the testimony which he gave on the witness stand relative to him being present. These witnesses testified that they took the statement from Granger. as a protection for the members of the fire department, so as to show why they did not appear at the scene of the fire sooner.
The evidence introduced by the defense indicates that the installation by the defendant power company was proper. Without going into detail of a highly technical matter, it was shown that the fuses as applied at the transformer bank and the lateral station were of proper rating for this particular installation. This was admitted both by Mr. Todd, who testified as an expert on behalf of petitioner, and Mr. Ben Segall, who was the expert testifying on behalf of defendant. We are favorably impressed with the testimony of Mr. Ben Segall as was obviously the Lower Court. Mr. Segall testified that the service pole operated by the defendant company was adequate. As to the question of the swaying or vibrating of the pole, he testified that in order to *692 cause “arcing” and “sparking” along the wires, or to effect the lines in the conduit, the pole would have to sway at an appreciable angle, and that before this angle would be reached, the pole would snap. He compared the rigidity of the pole to that of a pencil, which could be bent only to a slight degree before it would break. Mr. Segall testified that the fusing at both the lateral station and the transformer bank were in accordance with the National Electric Safety Code, and that a short circuit would cause these fuses to blow within a period of from %rds seconds to 2 seconds. In this short period of time, there would not be enough heat generated to cause a fire in the Kemra mill. Mr. Segall testified relative to the dry type transformer maintained by the lumber mill in the filing room and testified that this type of transformer constituted a hazard in a saw mill because it needed air for cooling purposes. The hazardous condition could be caused by dust or sawdust accumulating on or about this type of transformer. He agreed with Mr. Todd that it was actually impossible to determine the cause of the fire, and “it becomes a hen and egg proposition as to whether the fire started the short circuiting or the short circuiting started the fire”.
One other point which we believe to be worthy of mention is as to the extent of the fire at the time that the various witnesses arrived upon the scene. The record reflects that the witnesses who testified as to the beginning of the fire arrived upon the scene at approximately the same time as the fire trucks. The fire company was called by night Marshall Ryles who reported to Jeff Easley, who was at the firehouse, “look out the window, the whole south end of town is on fire”. This indicates to us that the fire had progressed to a great extent prior to it being noticed by any of the witnesses who testified upon this trial. We believe, as was testified by Mr. Segall, that it is impossible to determine the origin of the fire.
We, as was the Lower Court, are unable to determine the origin of the fire in the Kemra mill. To attempt to reach a conclusion in this regard would constitute a resorting to speculation. The evidence as a whole indicates that it was entirely possible that the fire could have been commenced either from some defect within the lumber mill, or as a result of some hazardous condition existing inside the mill. The testimony of the experts is to the effect that a fire which started inside the mill could have caused a short circuit which could have resulted in the “sparking” or “arcing” which was testified to by some of the witnesses. In any event, the petitioner has failed to prove any negligence whatsoever on the part of the defendant.
As to the question of the doctrine of res ipsa loquitur, we believe that same would not apply in this case. The petitioner has failed to show that the fire started in any instrument which was under the control and management of defendant. The Courts have held that the doctrine applies ordinarily or generally under circumstances showing that the offending instrumentality was in the possession and control of defendant and his employees and agents, and that the cause of the occurrence was unknown to the plaintiff and could not have reasonably been expected to be within his knowledge. Carter v. Middleton, La.App., 76 So.2d 594; Northwestern Mutual Fire Ass’n v. Allain, 226 La. 788, 77 So.2d 395, 49 A.L.R.2d 362.
We fail to find any obvious error on the part of our learned sister below, and, for the reasons hereinabove assigned, the judgment of the Lower Court will be affirmed, all costs of this appeal to be paid by petitioner.
Judgment affirmed.
ELLIS, J., recused.