DOMINGO BURGOS QUIÑONES ET AL., Plaintiffs and Appellees, *v.* PUERTO RICO WATER RESOURCES AUTHORITY, Defendant and Appellant.

No. R-63-16.     Decided June 12, 1964.

598

*José Antonio Arabía* and *Carlos Santos Correa* for appellant.
*Julio Fernández Cabrera* for appellees.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE DÁVILA delivered the opinion of the Court.

A fire destroyed two houses which belonged to plaintiffs. They filed a complaint for compensation alleging that the fire originated in the electric lines property of the Water Resources Authority, and that it was due, solely and exclusively, to the latter's negligence.

The case having been heard on its merits, the Superior Court, Ponce Part, sustained the complaint maintaining that "the fact that an inhabited house is burned is not an ordinary accident which generally occurs without the intervention of a negligent act on the part of someone. In this case the electric lines outside the house and the meter were under defendant's exclusive control and supervision. Not even the slightest act of negligence on the part of any of the plaintiffs has been brought to court, and although defendant in its plea alleged that the fire was the result of extraneous causes not under its control, it did not introduce any evidence which could shed any light as to the origin of the fire." The trial court understood that in the light of said determination the inference of *res ipsa loquitur* is applicable to the case at bar, and sustained the complaint.

From the evidence introduced in the respondent court it appears that on January 7, 1960, plaintiffs Eusebia Costas Pons and Domingo Burgos Quiñones were respectively the owners of two zinc-roofed frame houses in the ward Coto Canas of Ponce. They got their electricity through an exterior circuit belonging to the Water Resources Authority. It consists of a fused insulated transformer of 37 K.V.A. from which wires extended to a pole near the scene of the fire. From the pole also protected by fuses, two seventy-five-foot long service lines No. 10 weatherproof type with tar jacket insulation run the power into a meter common to both resi-

dences installed on the left-hand exterior wall of Eusebia Costas Pons' house. The electric current used in Domingo Burgos Quiñones' house ran through this meter. The exterior circuit as well as the meter met all the requirements imposed by the National Electric Code and were under the supervision and control of the Water Resources Authority.

Plaintiffs introduced evidence to establish that the residences were destroyed as a result of a fire which was originated in the service lines leading to Eusebia Costas Pons' residence. They had three witnesses. Of these, the only witness presented by plaintiffs for the purpose of establishing the origin of the fire was Lydia Esther Rivera Pons. In synthesis, she testified that on various occasions she had requested defendant to remove the meter "because the board on which the meter was installed was in bad condition"; that on the day of the fire the witness' son and her nephew, Wendel Pons, 11 years old, who did not testify at the trial, were at Eusebia Costas Pons' house. That she was at the public water tap on the corner of her house when Wendel Pons came and said, "run, Lydia. The wires are on fire . . . . I ran. A group of people were watching, then I joined the group, and I saw the wires touching each other causing fire . . . . I saw when the meter exploded and the fire started."

But on cross-examination the same witness testified the following:

"Q. When you arrived at the house, when you arrived at the house, did the house catch fire?

"A. The house was already on fire. (Tr. Ev. 12.)

". . . . . . . . . . . . . .

"Q. The truth is that you did not see when the fire started?

"A. I did not see it." (Tr. Ev. 13.)[1]

Further on she admitted having signed, on January 19, 1961, a written statement from which it appears that what her

---

[1] From the witness' testimony it appears that the fire had already started when she arrived at the house after being notified.

nephew yelled at her when he reached the public water tap was "Lydia, smoke is coming out of your room, and then I ran immediately to see what was happening and when I arrived in front of my house I saw smoke coming from the meter and the wires leading from the pole to the meter were on fire."

Defendant introduced oral evidence as well as expert testimony in order to prove not only the safety of the installation under its control and supervision but also the physical impossibility of the occurrence of the fire in the manner described by plaintiffs.

The meter as well as the safety switch disappeared in the fire, but it was established by the defendants that after the occurrence of the fire the wires in which it is alleged started the fire were covered with their insulation in all their length, except in a distance of 5 or 6 feet from the house burned, in which the insulation had disappeared. They did not show either any sign of having been in contact with each other.

Subsequently, defendant, through its expert, electrical engineer Juan Capestany, prepared an experiment in court tending to show what occurs in an installation similar to the one at bar when a short circuit is produced.

The experiment showed that when two bare wires come into contact a short circuit occurs which immediately blows the fuses protecting the service wires and the current is interrupted through said wires.

When asked whether, taking into consideration the type of fuses used by the defendant and the speed with which they blow out in cases of short circuits, it was possible that the temperature generated by the cables would, at that moment, cause the spontaneous combustion of the wood, he testified, "It is physically impossible."[2]

---

[2] "MR. SANTOS CORREA:

Generally, how much heat is generated by the cable in a short circuit, the temperature?

On performing the experiment presented to the court it was shown that in the place where two wires make contact when there is a short circuit there are signs of a broken wire in one of them, a condition which did not appear in the service wires in question.[3]

Further on, upon questioning by the trial judge, Engineer Capestany explained that "it is impossible" for a meter to explode in the manner testified by witness Lydia Esther Rivera Pons, because said equipment is not vacuum sealed, and he was of the opinion that what possibly occurred in this case was that the heat generated by the fire was so intense at a particular moment that "it causes this glass to break" but not to explode as the witness testified.[4]

Capestany concluded that, considering all the concurring circumstances, it was physically impossible for the fire to originate as a result of electrical defects in defendant's installation.[5]

■ Analyzing the evidence referred to we cannot agree with the decision of the trial court. We have repeatedly

---

As such situation depends on the length of time that the current continues to flow or that the short circuit is maintained; and it also varies according to weather conditions, that is, whether it is raining or not; whether the wind is blowing or not; it varies with the prevailing weather conditions. You put the wires without temperature and if the wind blows it may rise to two hundred degrees Farenheit.

And can that temperature cause the spontaneous combustion of wood?

It is physically impossible."

[3] "You noticed. That spark is the arc. A short circuit was formed . . . with the wires. You will notice that in the place where contact was established there is a mark of broken wire, welded. *This mark or condition would have been present in the service wires if they had come in direct contact.*" (Italics ours.)

[4] In *Kentucky Power Company* v. *Dillon*, 345 S.W.2d 486 (Ky. 1961), in considering a witness' testimony to the effect that a meter exploded, it is commented that an exploding meter would indeed be a "phenomenon."

[5] "Q. What do you think was the cause of the fire?

A. As I told you before, it could have been something burning, or an

stated that "persons or enterprises engaged in generating and distributing electricity should exercise the highest degree of care to avoid damage, considering the inherently dangerous character of this element." *Matos* v. *P.R. R. L. & P. Co.*, 58 P.R.R. 162, 166 (1941); *Ramos* v. *Water Resources Authority*, 86 P.R.R. 572 (1962). However, the one engaged in furnishing power does not have the liability of an insurer and it shall assume no liability unless causal relationship is established between the damage and the instrumentality, property of and under the control of the defendant. *Kentucky Power Company* v. *Combs*, 305 S.W.2d 105 (Ky. 1957); *Tibbetts* v. *Central Maine Power Co.*, 49 A.2d 65 (Maine 1946). It is the duty of the plaintiff to prove by a fair preponderance of the evidence not only this causal relationship but also that the damage has been produced by defendant's fault or negligence in failing to use a degree of care and diligence proportionate to the danger involved. *Widow of Dávila* v. *Water Resources Authority*, ante, p. 316. *Wickline* v. *Monogahela Power Co.*, 81 S.E.2d 326 (W.Va. 1954). As stated in *Tibbetts* v. *Central Maine Power Co.*, *supra* at 69:

"In order to recover, the plaintiff must do more than merely prove he has suffered a loss. He must prove a wrong, the cause thereof, and trace it to the defendant. The burden of this proof rests upon the plaintiff. It is incumbent upon him to show how and why the fire occurred—some fact or facts by which the cause can be determined by the jury, and not left entirely to conjecture, guess or random judgment. He is required to prove by a preponderance of the evidence that the fire was caused by some agency for which the defendant was responsible. It is not sufficient that the evidence show a possibility, or even a mere probability, that the fire was caused in the manner charged. It must be based upon facts proved, or regarded as proved."

---

appliance.
Q. Was it the result of electrical effect?
A. It is absolutely impossible."

Certainly, we cannot affirm that plaintiffs' evidence established said causal relationship. *Kentucky Power Company* v. *Dillon*, 345 S.W.2d 486 (Ky. 1961). Witness Lydia Esther Rivera admitted that she did not see when the fire started; that "when I went to take the baby my room was ablaze." Nevertheless, she insists that she saw the wires *"crossing each other* and on fire," and . . . "then the meter exploded and the fire started." (Italics ours.)

■ The credibility of her testimony was affected, however, by her former statement presented in evidence by defendant to the effect that *"I did not notice whether said wires were crossing each other or not,* but I saw they were on fire." (Italics ours.) *Cintrón* v. *A. Roig, Sucrs.*, 74 P.R.R. 957, 961–62 (1953). The experiment in court showed that if the wires had been in contact, they would have revealed marks, which was not the case herein. The witness' testimony to the effect that the meter "exploded and the fire spread therefrom" vanished, as we have previously stated, in the presence of the physical impossibility that it could happen as she described it. "When physical situations or matters of common knowledge point so certainly to the truth as to leave no room for a contrary determination, based on reason and common sense, such physical situation and reasonable probabilities are not affected by sworn testimony which, in mere words, conflicts therewith." *Lamber* v. *Miller's Adm'r*, 125 S.W.2d 1019 (Ky. 1939); *cf. Román Montalvo* v. *Delgado Herrera*, 89 P.R.R. 419 (1963).

The evidence adduced by plaintiffs only established that there was a fire in plaintiffs' residences. When witness Lydia Esther Rivera arrived at her house she found "there was smoke" in the house and the wires "were on fire"; that due to the heat generated by the fire the glass which protects the meter broke and the service wires were exposed five or six feet from the house, and they fell in the yard of the destroyed house.

■ These facts, by themselves, are not sufficient to hold defendant liable. They do not establish causal relationship between the damages and appellant's installation; and we cannot speculate concerning the origin of the fire. *Kentucky Power Company* v. *Combs*, 305 S.W.2d 105 (Ky. 1957); *Smith* v. *Kentucky-West Virginia Power Co.*, 283 S.W.2d 376 (Ky. 1955); *Kemra Lumber Co.* v. *Louisiana Power and Light Company*, 132 So.2d 688 (La. 1961); *Darlington* v. *Owern Country Rural Elec. Coop. Corp.*, 229 S.W.2d 599 (Ky. 1956); *cf. Kentucky Power Company* v. *Davis*, 370 S.W.2d 826 (Ky. 1963).

■ Appellant vigorously opposes the application of the doctrine of *res ipsa loquitur* to the case at bar. We agree. In the absence of a determination of the causal relation between the circuit and the damage caused, the application of said doctrine did not lie. *Castro* v. *Municipality of Guánica*, 87 P.R.R. 690 (1963).

In *Kentucky Power Co.* v. *Dillon*, 345 S.W.2d 486 (Ky. 1961), evidence similar to the one presented to the trial court was introduced. Plaintiff's residence was destroyed by fire. The fire started when the owner had gone to the well near the front porch to fetch a pail of water. From there she saw a "blue looking blaze" on the side of the house where the electrical wires were connected. Another witness, her brother-in-law, testified that he heard a noise on the pole where the transformer was installed and saw fire flying from the wires and the meter busted, blow to pieces.

Taking said evidence into consideration, the court stated:

"If it be conceded that the plaintiffs' evidence brought the case within the res ipsa loquitur rule with respect to control, at most it established only the possibility that the phenomenon described caused the fire. That is not enough. Kentucky Power Co. v. Hogg, Ky., 301 S.W.2d 1. We cannot, in good conscience, say that there was any evidence of probative value to show that the fire was caused by a defective or faulty condition of the defendant's wires and equipment. Kentucky Power Co. v. How-

ard, Ky., 296 S.W.2d 463; Kentucky Power Co. v. Combs, Ky., 305 S.W.2d 105."

■ In the present appeal, even if we admitted that the doctrine of *res ipsa loquitur* is applicable to the events in the present case, we understand that the permissible inference which could have arisen upon the application of said doctrine was amply rebutted by the evidence introduced by appellant establishing the physical impossibility of the occurrence of the fire as alleged by plaintiffs. *Castro* v. *Municipality of Guánica, supra.*

The judgment appealed from will be reversed.