**BARTLEY & SENTERS COAL COMPANY, Appellant,**

v.

**Linzie H. HALL and the Workmen's Compensation Board of Kentucky, Appellees.**

Court of Appeals of Kentucky.

Oct. 29, 1965.

As Modified on Denial of Rehearing March 25, 1966.

William J. Baird, Baird & Hays, Pikeville, for appellant.

Burnis Martin, Paul E. Hayes, Prestonsburg, Robert F. Matthews, Jr., Atty. Gen., Frankfort, for appellees.

STEWART, Judge.

One question is raised in this appeal: Was there sufficient evidence of substance to support the Workmen's Compensation Board's finding of fact that appellee-employee, Linzie H. Hall, was injuriously exposed to the hazard of silicosis while employed in a mine of appellant-employer, Bartley & Senters Coal Company, from April, 1960, until November, 1961? See KRS 342.316(12).

Appellee, testifying for himself, stated that appellant's mine was not mechanized; that it utilized no cutting machine in extracting coal but that the coal was "shot from the solid"; that all the coal was loaded and hauled out in rubber-tired buggies; and that he did not know whether the top and bottom of the space where he worked were slate or rock.

Appellee's description of the presence of dust during his work in appellant's mine was brought out on direct examination as follows:

"Q. 52 Did you have occasion to come in contact with any kind of dust while working there?

A. Yes, we shot a lot of rock every day and there's powder on top of your coal.

Q. 53 What kind of rock was it?

A. It was hard rock, looked like sandstone. You couldn't beat it with a hammer. We would have to lay powder on it and lay a lot of stuff on it before we could shoot it and load it.

Q. 54 Did that cause dust?

A. Yes, sir, lots of dust.

Q. 55 Was there any coal dust there where you were working?

A. Yes, sir.

Q. 56 Was there a little or a whole lot?

A. There was a right smart of coal dust.

Q. 57 Was there any sandstone dust there?

A. There was a lot of white dust when we would shoot that rock.

Q. 58 Is there any sandstone rock in that mine?

A. It looked like sandstone top. It was white rock, looked to me like it was sandstone.

Q. 59 You took it to be sandstone?

A. Yes. It would fall in big slugs.

Q. 60 Would there just be dust certain parts of the day or all day long?

A. I'll say for three or four hours, something like that, in a place where you shoot it.

Q. 61 How long would this dusty condition exist while you were loading coal there? How long a period would this dust continue while you were loading coal there?

A. Well sometimes a long time and sometimes it wouldn't last too long."

On cross-examination it was shown that appellee had worked in coal mines of the Inland Steel Company for about fourteen years. This employment terminated in 1957. He said that he did not have a certain job with Inland; but instead would sometimes work on a cutting machine, sometimes as a timberman, and sometimes as a drill helper. However, whenever he or any of the miners would drill they would use a respirator which would cover the mouth and nose. In order to get from the tipple of the mine to the place where he worked, which appellee estimated to be a distance of two or three miles, a man-car was used. The man-car was pulled by a motor and appellee "imagined" they used sand on the motors and the track to get traction. There was rock in Inland's mine; although he did not personally "shoot" the rock, the men who did would use jack hammers which would cause rock dust. They had all kinds of machinery at Inland, including cutting machines, drills, bolting machines, and motor-cars.

Appellee's only other witness at the hearing was Richard Hall. There is nothing in the record which indicates he is related by blood or marriage to appellee. Richard Hall worked intermittently for appellant from 1955 to 1961 at the same location as did appellee. His testimony relative to the

dust condition of appellee's mine is revealed by his answers to the following questions:

"Q. 1 What kind of bottom did you have up there?

A. Well I don't know. I never paid too much attention to it Sometimes it looked like a slick bottom and sometimes it looked rough.

\* \* \* \* \* \*

Q. 10 Any rock dust or sandstone dust in that mine?

A. Where they would shoot it would be white rock. Maybe it would be a little while before we could go back and load coal. I say a right smart bit, maybe 45 minutes or maybe a hour before we could go back in and load it.

Q. 11 What about coal dust?

A. It was all through it look to me like."

The testimony of one of the owners of the mine and of five miners, some of whom had worked in the mine with appellee and all of whom were familiar with the mine, was to the effect that there was no sand dust in this mine. Also, there was a complete absence of sandstone from which silicon particles could be produced and there was no sand of any kind used in this mine, such as is found in mechanized mines where sand is used for traction on tracks. These witnesses stated that the roof and bottom of the mine were slate; that there was no sandstone in the coal seams; and that the coal was "shot from the solid," i. e., a small drill was used and the holes for the shots were drilled in the center of the coal seam.

The opinion of the Board contains only this bald finding on the question of whether appellee was injuriously exposed to the hazards of silicosis while working in appellant's mine:

"After reading the briefs of the parties hereto, the evidence, both lay

and medical, it is the opinion of the Board that there is sufficient evidence to show that the plaintiff *contracted* silicosis while working for the defendant * * *." (Emphasis added.)

We find no evidence in this case which in any wise establishes that appellee was exposed to silicon particles while in the employ of appellant. The testimony of the two Halls refers to "white dust" and "coal dust." However, it was not shown that either of these substances contained silica. The mine had no car tracks, no cutting machines. It was not revealed that there was any sand in this mine; nor any rock formation, such as sandstone, with which sand is combined. Sand is impure silica and when ground up into fine dust, such as occurs when motors use sand for traction on rails inside the mines or when cutting machines grind into the sandstone top or bottom of a coal seam, the fine minute particles of silica may be breathed into the lungs by anyone exposed to it.

Upon appellee was cast the burden of proving by competent evidence all the facts necessary to establish his claim. See City of Prestonsburg v. Gray, Ky., 341 S.W.2d 257; Walker v. Lebanon Stone Company, 312 Ky. 624, 229 S.W.2d 163. As was stated in Kentucky Power Company v. Dillon, Ky., 345 S.W.2d 486, 489, " * * the evidence * * * to sustain an issue must be evidence of 'substance and consequence, carrying the quality of proof and having fitness to produce conviction.' "

We conclude the Board's finding of fact that appellee was injuriously exposed to the hazards of silicosis while working for appellant is not supported by any evidence of substance.

Wherefore, the judgment is reversed with directions that a new one be entered ordering appellee's claim to be dismissed.

HILL, J., not sitting.