14339

LANCASTER v. SOUTH CAROLINA POWER COMPANY

(186 S. E., 911)

Before GREENE, J., Bamberg, October, 1935.

*Messrs. J. Wesley Crum* and *G. L. Buist Rivers,* for appellant,

*Messrs. B. E. Carter* and *Kearse & Kearse,* for respondent,

July 21, 1936.

The opinion of the Court was delivered by MR. CHIEF JUSTICE STABLER.

This is an action for damages alleged to have been sustained by plaintiff through destruction by fire of his gin house and its contents. The following facts appear: The building in question, constructed of wooden frame and covered with metal sheeting, was in the town of Govàn. For a number of years the defendant company furnished Lancaster with electric power and current for the operation of his ginnery and for lighting purposes. The current was conveyed into the building by means of wires extending from the company's main transmission power line; the heavy-voltage wires entering near its southeastern corner and the lighting wires near the southwestern corner. The lighting wires were provided with a meter and a switch on the inside of the building, were placed about four inches apart, and extended downward for approximately three feet from the point of entry through the wall. During the year 1932, as the result of a controversy between Lancaster and the company, the latter removed the meter and switch from the lighting wires and also disconnected the power wires, and thereafter ceased to furnish Lancaster with electric current for the ginnery, either for power or for lighting purposes. According to plaintiff's testimony, the company, however, did not remove either the power or the lighting wires from the building, but left them intact at its pole on the outside, and suspended through the air several feet above the ground to and through the wall into the building. Also, left the lighting wires hanging down three feet on the inside of the house, loose and unattached, and uninsulated at the ends for approximately three inches.

In the first part of the night of May 31, 1935, during an electrical disturbance and while rain was falling, the build-

ing and its contents, consisting of cotton gins and accessories, baled hay, etc., were completely destroyed by fire. The complaint alleged, among other things, that the burning of this property, resulting in much loss to the plaintiff, was due to the following acts of negligence on the part of the defendant:

"(a) In failing to remove its power and light transmission wires and appliances from the plaintiff's building when its service was discontinued during the year 1932.

"(b) In leaving the aforesaid power and light transmission wires and appliances in plaintiff's building after the same had been disconnected without having the same properly insulated, guarded and grounded, or otherwise made safe and secure against fire hazards.

"(c) In leaving its said power and light transmission wires suspended through the atmosphere from its main transmission power line into said building charged with electric current, and with the ends of said wires hanging loose, in close proximity and near contact, raw, uninsulated and ungrounded, with knowledge that dry hay and other easily ignited matter was stored in said building in close proximity to said wires, and knowing that the plaintiff was unaware of the condition of said wires and the hazard created thereby.

"(d) By leaving in the plaintiff's said building a dangerous fire hazard in the form of uninsulated and ungrounded highly charged electric wires, or wires connected with or closly joined to highly charged electric wires, with the ends thereof in close contact.

"(e) By leaving in the plaintiff's said building a dangerous fire hazard in the form of suspended, ungrounded wires leading from defendant's highly charged electric transmission lines into the plaintiff's building, which furnished a perfect conductor for electricity and lightning charges from the atmosphere.

"(f) In failing to have sufficient and adequate lightning arresters and other safeguards on its electric transmission lines.

"(g) By leaving the aforesaid electric wires, lines and appliances in the condition aforesaid in the plaintiff's building for an unreasonable length of time after they had been disconnected from the plaintiff's machinery, with full knowledge of the dangerous fire hazard thereby existing."

The defendant denied all allegations of negligence on its part and alleged that the damages, if any, sustained by the plaintiff at the time referred to in the complaint, were "caused in whole or in part, or were contributed to, by the negligence and want of care of the said plaintiff." It also alleged that the fire did not result from a charge or overcharge of electricity supplied by the company, but was "caused by the act of God in the form of an electric charge from the atmosphere, unmixed with negligence on its part."

Motions for a nonsuit and for a directed verdict, made at proper stages of the trial, were refused, and the jury found for the plaintiff $1,800.00. The defendant excepts and brings error.

It is not our purpose to discuss the appellant's five exceptions *seriatim,* as they all relate to the refusal of the trial Judge to direct a verdict and may be disposed of together. They fairly raise the following questions, upon the determination of which the issues presented by the appeal depend: (1) Was there any evidence of actionable negligence as alleged in the complaint? (2) Was plaintiff barred recovery because of contributory negligence? Or (3) because of an intervening act on his part which operated as a proximate cause of the fire?

The principles of law applicable are well settled. Before the plaintiff can recover he must prove by the preponderance of the evidence one or more of the specifications of negligence alleged in the complaint; and he

must recover, if at all, on the material allegations of his complaint which have been proved. He will not be allowed to have judgment on mere surmise or conjecture. In *Crosby v. Railway*, 81 S. C., 24, 31, 61 S. E., 1064, 1067, we find the following, which is quoted with approval in *Moseley v. Southern Railway Co.*, 164 S. C., 193; 162 S. E., 94; 95, upon which the appellant here relies: "As declared in *Taylor v. Ry.*, 78 S. C., 552, 556; 59 S. E., 641, a scintilla of evidence is any material evidence which, taken as true, would tend to establish the issue in the mind of a reasonable juror. The law affords no redress for wrongs which exist wholly in the imagination. Verdicts cannot be allowed to rest upon mere surmise, conjecture, or caprice. The law is moved by material evidence, including proven facts and those presumptions which the law recognizes from motives of public policy and as founded in human experience. A court fails to exercise its high prerogative to administer justice according to law when it permits a verdict to stand which finds no support in the evidence."

With the foregoing principles in mind, we turn to an examination of the testimony in the case at bar for the answer to the first question.

The plaintiff Lancaster testified that he was the owner of the building that was burned, the ginnery having been installed in 1923; that at first he purchased electric power from the Easterling Company, which then owned the electric line to Govan, and paid for it on the basis of bales actually ginned, but after the defendant company bought the line, it charged him so much per kilowatt used; that the line furnishing the power to run his gins carried 2,300 volts and the meter for this current was put on a post on the outside; that the company furnished him lights over its 110-volt line, and "ran their wires in through the building and connected them on studs, and had a one by six board across the studs, and they put a meter in over there"; that it also placed a switch there and ran the line to the meter

and then on to the switch; that these wires entered the building at its southwestern corner.. He also said that some controversy arose between him and the company about a bill, and as a result it cut off the power; that the witness then asked the company to also cut the 110-volt line, the one here involved, as he had no need for that after the other was discontinued; that "they took the meter out and took the wires loose from the switch, and they left them suspended about this way (indicating to counsel and the jury), and they were raw from two to four inches on the end of the wires"; that these wires, "left dangling, were in three or four feet of the southwestern corner" of the building, where there was a window "just latticed up." He further testified that about 10 o'clock on the night of May 31, 1935, the building and its contents were burned; that at the time there was an electric storm and rain; that "there was several claps of lightning, but there was two or three that was very·sharp, and you could tell it had struck power lines or something, and we knew it had struck something, but we didn't know what it had struck until about fifteen minutes after the second shot or report"; that after he heard the second report it was about five minutes before he learned that there was a fire, and the witness then went down town and found that his ginhouse was burning; that most of the fire was in the southwest corner of the building where the ·110-volt line went in, "and it was well lit up" and had evidently caught on the south end of the structure; that the witness did not see "any evidence that lightning had struck the building anywhere"; that when he arrived on the ground a man by the name of Chitty was already there and in a short time others came; that the power company sent a representative at once, a Mr. Shilletto, to disconnect the wires, and in the presence of the witness and of others, he stated "there was no danger in the 2,300-volt line, but there was in the 110-volt line, and when he did I said to him was the current on the 110 line, and he said yes"; that when the

building fell in, this representative of the company, after putting on rubber gloves, stood on the ground and cut the wires and then wrapped them around the post; that Shilletto did not go up the pole that night, but the witness was advised that he came back the next morning and did so. Lancaster also testified that he did not know the current was on the 110-volt line until that night, when he was told so by the company's representative; that the wires were in the same condition at the time of the fire they had been in ever since the meter was taken out, and the witness did not know that there was any danger; that just prior to the fire the building was entirely closed up, the doors being shut and the hay visible only through the window that was latticed.

The testimony of Lancaster was corroborated by other witnesses in the main particulars. One of them, Julius Chitty, stated that he lived near the gin house and was familiar with the situation; that the pole spoken of by Mr. Lancaster was 50 or 60 feet from the south end of the building, and that the lighting wires ran in over the window on the southwestern corner; that when the meter was removed about 18 inches or two feet of the loose wires were left hanging down against the tin wall with about two inches of raw ends; that about 10 o'clock on the night of the fire a storm came up and there were two or three hard claps of thunder which sounded like the wires were being hit; and that the fire was burning at the southwestern corner of the building mostly when he got there. He further testified that he had the power company called, and that it sent Mr. Shilletto, its representative, who put on gloves and cut the two wires that ran to the west corner; and that Shilletto stated that "there was not any danger in the 2,300-volt line, but the little line was hot. He said that the 110-volt line was hot."

J. W. Eubanks also testified that he was familiar with how the wires ran in from the power company's line to the gin house; that the 110-volt wires came in to the left of the

window which was closed with slats, which had "three or four inches of space between them." He also stated that the gin house took fire and was burned during the electric storm; that he was present when the representative of the power company came, who "flashed a spot light to see if the wires were connected and they were, and he said there was not any danger in the 2,300-volt line, but that the 110-volt line was connected, and there was danger there"; and that "he went to the truck and got his gloves out and took his pliers and cut the 110-volt wires and wrapped them around the light pole."

The plaintiff also offered three electricians as expert witnesses. One of these, J. E. Salley, in answer to a hypothetical question, stated that he thought the condition in which the wires were left, as testified to by Lancaster, created a fire hazard. He also said, among other things, that wires hanging in the air as described by the witnesses would be a conductor for lightning, and, according to the underwriters, it was not a safe way in which to leave a building; the only absolutely safe way being to take the wires down. This witness also stated that he was somewhat familiar with the effects of lightning striking a power line; that sometimes it will smash up insulators and split poles in half, but frequently does not; that you cannot say what lightning generally does because it does many things that you cannot account for; and that there is no way of telling whether or not it has hit a line unless it leaves some evidence of it.

J. R. Jones testified to the same effect. He stated that from the experience which he had had in wiring houses and cutting off electricity, he did not consider the condition as described by the witnesses as a safe way in which to leave a building.

J. W. Dukes said that leaving wires on the inside of a building as here testified to was the unusual and dangerous way, and that the safest way was to disconnect them and take them down; and that even if there were no charge of

electricity on the wires thus left, still there would be a fire hazard to the extent that the wires would be a conductor for lightning.

Further quotation of the testimony, of which there is much, is deemed unnecessary. From that pointed out, it is seen that there was evidence positive and circumstantial, which tended to establish certain allegations of the complaint material to the issue; that the company did not disconnect the lightning wires from its main power transmission line on the outside of the building, thereby leaving the wires charged with electricity; that this created a dangerous fire hazard both from the electric current passing over appellant's power line and from electric charges by lightning from the atmosphere; that the fire started at or near the point where the wires were hanging loose within the building; that the ginnery took fire and was burned during an electric storm; that there was no fire in or about the building just before the storm occurred; that the appellant created the condition described and allowed it to exist for a number of years; and that the company had, or should have had, full knowledge of the hazard.

As stated in *Weeks v. Carolina Power & Light Co.,* 156 S. C., 158; 153 S. E., 119, 122: "Power companies and their employees, even more than all other people, ought to know the great danger of electricity. They ought to take care to see that their wires, which convey electric current, are properly guarded, so as to prevent injuries to persons and property. This duty is incumbent upon them under the law of this State."

While the proof did not show unquestionably how the fire originated, the facts and circumstances disclosed by the testimony for the plaintiff clearly presented such a question for the jury. In *Moseley v. Southern Railway Company, supra,* it was said: "The fact that an injury may have occurred in one of a dozen ways, of course, would not defeat a plaintiff's right of recovery if

the evidence tended to sustain the reasonable probability of the one relied on. In a civil case the law does not require proof to a certainty."

We are of opinion, from a careful reading of the record, that the trial Judge properly refused to direct a verdict on the ground that there was no evidence, or testimony from which a reasonable inference could be drawn, of actionable negligence on the part of the defendant as alleged in the complaint. The first question, therefore, must be answered in the affirmative.

Counsel for the appellant do not argue the second question at length. While it is true that the plaintiff stored baled hay in the gin house during the summer months when the gins were idle, we think that his alleged contributory negligence in doing so was, under the evidence in the case, peculiarly a question for the jury.

The third question must also be answered contrary to appellant's contention. Under the evidence, the trial Judge properly rejected this ground of defendant's motion for a directed verdict. In *Cannon v. Lockhart Mills,* 101 S. C., 59; 85 S. E., 233, 234, the Court said: "A careless person is liable for all the natural and probable consequences of his conduct. If the misconduct is of a character which, according to the usual experience of mankind, is calculated to invite or induce the intervention of some subsequent cause, the intervening cause will not excuse him, and the subsequent mischief will be held to be the result of the original misconduct. This is upon the ground that one is held responsible for all the consequences of his act which are natural and probable, and ought to have been foreseen by a reasonably prudent man."

The appellant, in support of its contention as to this question, relies upon *Foster v. City of Union,* 129 S. C., 257, 123 S. E., 839, and *Williams v. City of Sumter,* 149 S. C., 375; 147 S. E., 321. We conclude, however, upon an examination of these cases that they are easily distinguishable

by their facts from the case at bar and are not controlling here.

All exceptions are overruled, and the judgment of the Circuit Court is affirmed.

MESSRS. JUSTICES BONHAM, BAKER and FISHBURNE concur.

MR. JUSTICE CARTER did not participate.