C. M. Johnson

*v.*

Monongahela Power Company, *a corporation*

(No. 12082)

Submitted September 12, 1961. Decided December 12, 1961.

*Ernest R. Bell, Haymon H. Boggs,* for plaintiff in error.

*Linn Mapel Brannon, W. Paul McWhorter,* for defendant in error.

BERRY, JUDGE:

The plaintiff, C. M. Johnson, instituted an action of trespass on the case in the Circuit Court of Gilmer County, West Virginia, on October 1, 1958, against the defendant, Monongahela Power Company, a Corporation, to recover damages for the destruction of the plaintiff's two-story frame and block building located in the town known as Sand Fork in Gilmer County, West Virginia, the corporate name of said town being Layopolis.

The plaintiff's building was destroyed by fire alleged to have been caused by the negligence of the defendant. The jury returned a verdict in favor of the plaintiff in the amount of $14,000.00, on which judgment was entered on April 18, 1960. Upon application to this Court, a writ of error and supersedeas was granted to the said judgment of the Circuit Court of Gilmer County on November 14, 1960.

This action arose from a fire which occurred on March 31, 1958, destroying the building in question owned by the plaintiff. The building which was burned consisted of a garage on the first floor and two apartments on the second floor. Part of the contents of the building was also destroyed by the fire. The first story of this building was constructed of concrete blocks and the second story was constructed of wood with metal covering. At the time the fire occurred

the defendant furnished electric current to the plaintiff's building through three No. 8 copper weatherproof service wires emanating from a 5 Kilovoltampere self-protecting transformer attached to a pole located near a building owned by Ray Jones and situated some distance from the plaintiff's building. The transformer reduced the voltage on the primary wires from 7200 volts to 120-240 volts carried on the secondary service wires to the plaintiff's building. The three service wires were spaced 6 to 8 inches apart and were attached to three porcelain insulators located on the right front corner of plaintiff's building between fourteen inches and two feet from the roof and about eighteen feet from the ground. The service wires were run down plaintiff's building wall through a conduit and entered the plaintiff's building between the first and second stories into a service meter and fused switch box from which the power was distributed to various circuits in the Johnson property. The defendant power company is responsible for getting the power to the location of the insulators and on the entrance cable. The distribution beyond the insulators and over internal wiring is the responsibility of the person to whom the power is furnished. The weatherproofing on the service lines also serves as insulation. The installation of the service wires complied with the National Safety Code with regard to safety standards for external wiring. The National Electric Code deals with the safety standards for internal wiring and both of these Codes have been adopted and approved by the rules and regulations of the Public Service Commission of West Virginia which regulates the conduct of utilities in this State. There is conflict in the evidence with regard to the condition of the weatherproofing on the service lines at the time of the fire. The plaintiff's evidence indicates that the weatherproofing was in poor condition, having strips of outer covering hanging down and bare places where other wires were attached to the service lines in order to furnish power to a stop light in the town of Layopolis. The defendant's evidence was to the effect that the

weatherproofing on the service lines was all right and not in a dangerous condition.

In 1951 the town of Sand Fork had a stop light erected near the plaintiff's building. The defendant had nothing to do with the erection of this stop light, and one thirty-five foot pole supporting the stop light was located or placed about eight or ten feet from the plaintiff's building at the intersection of Route No. 5 with the Sand Fork Creek Road. The plaintiff's property and the Ray Jones' property are located at this intersection. The plaintiff's property faces on State Highway No. 5 and the Jones' property on the Sand Fork Creek Road. Another thirty-foot pole supporting the stop light was placed diagonally across State Highway No. 5 from the plaintiff's property upon a bank about eight feet above the hard surfaced road. An uninsulated five strand steel cable, about three-eighths of an inch in diameter, known as a messenger wire used to support the service wires which furnished electric current to the traffic light when in operation was attached to both poles, but the messenger cable itself carried no electric power. When this cable was attached to the two poles by the town of Sand Fork it was hung about five or six feet above and across the three service wires leading to the plaintiff's property.

In 1954 a truck struck the stop light and damaged it. The damaged stop light was removed and although the town obtained another stop light, it was never replaced. The plaintiff was mayor of the town of Layopolis for a period of at least two years, between 1954 and 1956, and was instructed by the town council to do something about the stop light. After the new stop light was obtained, the plaintiff requested Chester Cunningham, a district representative of the defendant, to assist in the replacement of the stop light. It was ascertained at that time that the pole across the highway from the plaintiff's property needed a guy wire to support it and the plaintiff requested Cunningham to obtain one. Cunningham did not return

with the guy wire but the plaintiff told him later that the people upon whose land they intended to place the guy wire would not allow them to do so, and no guy wire was ever placed on the pole. At the time the plantiff and Cunningham were discussing the replacement of the stop light they both examined the pole in question and found that it was not secure and that it would be necessary to have it guyed or supported. The condition of the pole, which later fell, was fully known to the plaintiff as well as to Cunningham.

About 2:15 on the morning of the fire the pole referred to above located across the highway from the plaintiff's building fell, allowing the messenger cable, which was attached to both the pole near the plaintiff's building and the pole which fell and which was used to support the abandoned stop light, to come in contact with and rest on the service wires leading to the plaintiff's building. A few minutes later the fire was discovered in the plaintiff's building.

There is no direct proof as to what caused the fire. The plaintiff was awaken about 2:15 a.m., apparently by the noise when the pole fell. He stated he saw a flash and told his wife to call the power company or the sheriff and report the falling of the pole. He then went outside his building and saw a blue arc near where the service wires were attached to his building. He also testified that he saw a similar arcing on the side of the Jones building which was served by the same transformer. The plaintiff stated that it was about three or four minutes after the pole fell before he went outside and saw the arc and then re-entered the building to warn his wife to be careful, and when he went outside again he saw that his building was on fire, both inside and outside near where the service wires were attached. One of the plaintiff's witnesses who lived across the street testified that she discovered the fire first and telephoned the Johnsons to tell them their garage was on fire. This witness also testified that balls of fire were flashing in her house at the same time and that sockets were smok-

ing, and although the plaintiff testified that this witness' house was served by the same transformer, he later admitted that it was on a different transformer, in accordance with testimony of the defendant's witnesses, and was therefore served by a different transformer. This witness, as well as another witness for the plaintiff who lived in the same house, testified she saw a ball of fire or a red spot on plaintiff's building above where the service wires were connected and near the roof. Ray Jones, the owner of the nearby building stated he saw fire coming out of plaintiff's building near the roof. The Glenville Fire Department, which had been called at the direction of the plaintiff, and a representative of the defendant arrived on the scene about thirty minutes after the fire, at which time it was burning violently. The defendant's employee who testified during the trial stated that he climbed the pole upon which the transformer was located and cut the wires leading to the Johnson building near the transformer. At the time they were cut, the service wires were intact with the messenger cable resting across them and there was no arcing. The defendant's employee who cut the wires stated he did so without the use of gloves and that there was no power on the wires at that time, which indicated that there was no power coming from the transformer. Defendant's witness also stated that the transformer was intact. However, Ray Jones testified that he saw black smudge spots on both the transformer pole and on his building.

The defendant's employees, as a matter of precaution, cut the power for the whole area from the substation, but restored it about forty-five minutes later after it was ascertained that no further precaution was necessary. The same transformer served the plaintiff's building, the Jones building, and the home of R. C. Burke, which was located across the highway or road from the plaintiff's building. Ray Jones operated a store and lived in his building which was served by the same transformer as the Jones building. He

testified that he left a light on in the store and that it went out after the pole fell. He also testified that there was no damage to any electrical equipment in the store which consisted of deep-freeze units, heaters, meat case, etc. The defendant's employee who cut the wires at the transformer saw no light in the Jones store at the time he cut the wires.

The plaintiff testified that he saw no fuse on the transformer but the defendant's witnesses testified that the transformer was a self-protected type and had an internal fuse. The primary supply line to this transformer was 7200 volts which was reduced by the transformer to about 240 volts which was furnished to the customers with the three service lines which carried 220 to 240 on the outside service lines and 110 to 120 from either service line to neutral or ground, giving the customers either 110 to 120 or 220 to 240 volts, as needed for the various electrical appliances in their buildings. The variation in voltages as from 110 to 120 and 220 to 240 is a nominal one depending on transformer load, but the higher voltage is about twice the lower one.

The electrical equipment in the transformer was immersed in oil to furnish insulation and quenching action in case of trouble. The oil was contained in a steel case into which the coils or wires were dropped and a lid resting on a gasket was bolted to the case resulting in a tight seal. The fuse in the transformer was a 5 ampere fuse which consisted of a fine wire and it can temporarily take $7\frac{1}{2}$ amperes without melting or "blowing". Under normal conditions the high voltage on the primary line would only create an electrical flow of small amperage due to the fact that voltage and current bear inverse ratios, but when voltage is reduced in the secondary the amperage rises inversely so that the amperage furnished to household users necessitates the use of from 15 to 60 ampere fuses in the various circuits. The purpose of the fuse or circuit breaker is to open the circuit in case of an overload. The object of opening the circuit is to re-

move current from wires in electrical appliances which through short circuits or overloads might be themselves destroyed or cause a fire.

According to the expert witnesses who testified in this case, both on behalf of plaintiff and on behalf of defendant, when the messenger wire fell on the service lines connected to the plaintiff's building, if it created a short circuit it would blow the fuse in the transformer if there was a proper fuse contained therein and would thus cut off the current in plaintiff's building and other buildings served by the same transformer. The plaintiff himself admitted that if the transformer had been fused, the fuse would have blown when the lines were short circuited and would have cut off the power to his building, and that there would have been no fire caused by the defendant's power lines. The defendant contended that the fire started inside the plaintiff's building and was caused either by plaintiff's wiring being over-fused or improperly installed. The plaintiff, although not an electrician, did some of the internal wiring of his building. However, he had had considerable experience with electricity while working in the mines. It was established that the proper fuse to be used in the plaintiff's building was a 30 ampere fuse on his service entrance switch. He was so advised by the defendant's employees, and the plaintiff claimed that he was using a 30-ampere fuse at the time of the fire but admitted that there was a 60-ampere fuse switch box in his building between the entrance cable and the back of the building but claimed it was not in use at the time of the fire. He stated that it had been used in connection with a trailer outside his building some time before the fire. One of the defendant's witnesses, an employees, stated that he had looked through a window of the building of plaintiff some time after the fire started and while the building was burning and had seen a 60-ampere switch box with fuses in it under the meter box, but that the fuses were burned and the power was off. The plaintiff's expert witness testi-

fied that if the messenger cable fell across the service wires they would be compressed together and cause a short circuit and result in a violent discharge of flame or arcing, accompanied by a loud noise until the protective device [fuse] or the wires burned through, but that if the protective device or fuse failed to work the current might cause the insulation on the wires near the building to collapse and sufficient arcing would occur to ignite the building. However, he stated that if a proper protective device or fuse was present it would not happen thus, and if the fuse in the transformer was blown it would cut off all power to the customers on the same transformer. The defendant's expert witness testified that it was virtually impossible for the plaintiff's building to have been set afire when the pole fell allowing the messenger cable to fall across the service wires to plaintiff's building because the only electrical occurrence that could happen would be that a short would occur on the secondary or service lines, lowering the voltage but increasing the amperage and blowing the fuse in the transformer, and that nothing could have caused the fire except improper wiring or overfusing in the plaintiff's own building.

The defendant's expert witnesses also testified that the transformer could only be destroyed by physical damage such as lightning striking the transformer allowing oil to leak from it. Also, that inasmuch as damage was not done to electrical equipment of the other customers this would indicate that the primary high voltage did not reach the secondary lines, although if the motors in the various electrical equipment were not running at the time any high voltage escaped from the transformer it may not have damaged such equipment. The defendant attempted to introduce into evidence the transformer located on the pole at the time of the fire but the trial court refused to allow its admission. Apparently the court's refusal to allow the transformer to be introduced into evidence was not because it was not identified as the same transformer but because of a missing link in the chain of possession.

One of the defendant's employees testified that he took the transformer off the pole about daylight on the morning of the fire and delivered it to another employee in Sutton. This employee made a record of the delivery and recorded the serial number. He identified the transformer in the court room at the time of the trial as the same transformer having the same serial number. This employee sent the transformer to the substation foreman in Webster Springs, but could not remember who delivered it to the substation foreman in Webster Springs. However, the substation foreman identified the transformer in the court room at the time of the trial as the one sent from Sutton; and testified that it was in the same condition as it was when he received it except for some paint skinned off the lid when he took it off to examine it.

The plaintiff was not familiar with transformers containing internal fuses. The expert witness who testified for the plaintiff was not too familiar with this type of transformer. No witness testified for the plaintiff that there was not a self-protective fuse in the transformer and that it did not function properly in this case. The defendant's expert witness, Summers, testified positively that the fuse in the transformer blew and stated ''I think it is a certainty that it was blown because no one could get service from that transformer and it had to be replaced.'' The defendant's expert witness, Shearer, testified positively that in the condition he saw the transformer ''The fuse was blown''. Chester Cunningham, a district representative of defendant, who was on the scene at the time of the fire and made an inspection of the transformer after the fire, testified that ''The internal fuse had operated as it should have'' and that ''the fuse blew''.

It is stated in the plaintiff's brief that there was no evidence that there was a proper fuse in the transformer and one of the defendant's witnesses stated that it did not work properly. This is incorrect. There is ample and positive evidence that there was a proper fuse in the transformer and that it worked properly.

The plaintiff's brief refers to a page in the printed record to support the statement contained in the brief that the defendant's witnesses stated that the fuse did not work properly. The printed record does contain the word ''not''. However, an inspection of the original transcript of the record discloses the official record clearly shows that the word ''not'' has been deleted and such word should be omitted, and with the negative removed from the witness' testimony an entirely different meaning is conveyed.

The plaintiff's declaration contained three counts and specific acts of negligence were charged in each count. The first count charges negligence on the part of the defendant for permitting the service wires to become improperly insulated. The second count charges negligence on the part of the defendant for allowing the messenger cable to remain over the service wires connected to the plaintiff's building when it was unsafe to do so. The third count charges the defendant with negligence in not having a proper fuse in connection with the transformer.

Errors relied on by the defendant for reversal may be consolidated as follows: The verdict of the jury was contrary to the law and evidence; the town of Layopolis was guilty of primary negligence proximately causing damage to plaintiff's building and therefore the defendant was not liable for such damage; the contributory negligence on the part of the plaintiff barred recovery; the trial court refused to admit in evidence the transformer involved in this case; the trial court gave improper instructions and refused to give proper instructions with regard to the care and duty owed by the defendant.

The first assignment of error listed above is based on the contention of defendant that the town of Layopolis was guilty of primary negligence proximately causing the plaintiff's damage inasmuch as it owned and constructed the equipment in connection with the stop light used by the town and which fell upon the

service wires owned by the defendant, running to the plaintiff's property, and on the contention that the defendant had no control whatsoever over such equipment and therefore could not be liable for any damage caused thereby.

It is true that the town of Layopolis owned the poles and messenger wire attached to the two poles and initially erected this equipment in a proper manner. The messenger cable was placed over the service wires of the defendant more than the distance required for safety by the National Safety Code, approved by the Public Service Commission of West Virginia, which has the force of statutory law. A violation of such Code has been held to be *prima facie* evidence of negligence. 6 M.J., Electricity, Supp. to §2; *McKinney v. Appalachian Electric Power Company*, (W. Va.) 261 F. 2d 292, cert. denied 359 U.S. 926, 79 S. Ct. 609, 3 L. Ed. (2d) 629.

At the time of the erection of the poles in 1951, there is no evidence of any negligence on the part of the town of Layopolis or the defendant power company on the ground that such erection was not made under the approved standard of care required for such erection, but in 1954 the stop light was struck by a truck and damaged, and while the plaintiff Johnson was mayor of the town of Layopolis the town council authorized him to repair and replace the stop light, which was never done. However, it was during this time, around 1955 or 1956, that the plaintiff, while serving as mayor, consulted Chester Cunningham, as hereinabove stated a district representative of the defendant, with regard to the repair and replacement of the stop light. It was ascertained at that time by both Cunningham and the plaintiff that the pole which later fell was insecure, not firm, and leaned toward the highway. It was decided and agreed by Cunningham and the plaintiff that this pole should be guyed for support thereof, but it was never done because the owners of the property near where the pole was located refused to allow the guy wire to be placed on

their property. Therefore, the pole in question remained in such insecure position with the knowledge of the town, the defendant, and the plaintiff from that time until it fell in 1958. This would constitute negligence on the part of the town of Layopolis because it had the duty to repair, replace or remove the defective or insecure pole. But if the defendant actually knew of the dangerous condition, such as it did in the case at bar as clearly shown by the evidence, it would also be guilty of negligence and could be sued alone. 29 C.J.S., Electricity, §60; 18 Am. Jur., Electricity, §54; *Morrison v. Appalachian Power Co.*, 75 W. Va. 608, 84 S. E. 506; *Walters v. Appalachian Power Co.*, 75 W. Va. 676, 84 S. E. 617; *Staunton Mut. Telephone Co. v. Buchanan*, 108 Va. 810, 62 S. E. 928; *Virginia Electric and Power Company v. Daniel* 202 Va. 731, 119 S. E. 2d 246.

The defendant had a duty to protect or guard its service lines from any danger that the messenger cable might cause by falling upon and across them, by either taking proper steps to have the messenger wire removed or move its service wires to another location or place a protective shield between the messenger wires and its service wires, none of which was done. 29 C.J.S., Electricity, § § 46, 47; *Richmond & P. Electric Ry. Co. v. Rubin*, 102 Va. 809, 47 S. E. 834; *Phenix Fire Ins. Co. v. Virginia-Western Power Co.*, 81 W. Va. 298, 94 S. E. 372; *Hagerstown & Frederick Railway Company v. State of Maryland, For Use of Bruce A. Weaver*, 139 Md. 507, 115 A. 783, 19 A.L.R. 797 et seq; *Lancaster v. South Carolina Power Co.*, 181 S.C. 244, 186 S. E. 911.

For the same reason that the defendant power company may be guilty of negligence for the failure to take precaution and guard against the unsafe condition of the pole in question which fell, the plaintiff may be guilty of contributory negligence because he had the same knowledge of the unsafe condition of the pole and took no precaution with regard to the situation. The plaintiff not only had full knowledge of the con-

dition of the pole, of the fact that the messenger cable was over the service wires leading to his building, and of the fact that if the pole fell it would allow the messenger cable to come in contact with the service wires, as Mayor of the Town of Layopolis, but individually, both during the time he was Mayor and after he ceased serving in such capacity. Not only did he fail to take any action as Mayor, or later to have the town correct the unsafe condition of the pole, but he did not ask the electric company either to guard against the danger or to suspend the electric services. *Barnett v. Virginia Public Service Co.*, 169 Va. 329, 193 S. E. 538; 29 C.J.S., Electricity, §52; 18 Am. Jur., Electricity, §98; *Hagan & Cushing Co. v. Washington Water Power Co.*, C.C.A. (Idaho) 99 F. 2d 614.

It can thus be seen that in any event no recovery could be had in the case at bar for any negligence alleged in the second count of the declaration with regard to the unsafe condition of the pole which fell allowing the messenger cable to fall on the service wires leading to the plaintiff's building. However, this is not the answer to the case at bar, because the first and third counts of the declaration allege other specific acts of negligence on the part of the defendant power company relative to facts pertaining to the case after the pole fell allowing the messenger wire to fall on the service wires owned by the defendant. The first count of the declaration alleges negligence on the part of the defendant because of defective insulation of its service wires, and the third count alleges negligence on the part of the defendant for the failure to have a proper and adequate current breaker or fuse in connection with the transformer to which the service lines were connected.

The evidence with regard to whether the service lines were properly insulated or not at and before the time of the fire is conflicting, and on this question alone if it was the proximate cause of the fire and damage to the plaintiff's building it would be a jury question. But whether or not the service wires were

properly insulated is not determinative in the instant case. Even if there was no insulation or weatherproofing whatsoever on the service lines it would not by itself be conclusive of the right of recovery on the part of the plaintiff because the determining factor as to whether or not there could be recovery in the case at bar depends on whether or not there was a proper fuse in the transformer. When the messenger cable fell on the service lines it only created a short circuit which would not cause a fire because the electricity would not go into plaintiff's building when the short occurred, but would return to the transformer. If the transformer was properly fused, the fuse would burn out and cut off the power to the plaintiff's building and to all other customers served by the same transformer before any damage could occur to the structures. Under the facts in this case, if there was a proper transformer fuse, there would be no relationship between the insulation of the wires in question and the fire because any short created by the messenger wire, which did not carry electric power, falling on the service wires would not cause the fire. *Wickline v. Monongahela Power Co.,* 139 W. Va. 732, 81 S. E. 2d 326.

It can readily be seen that the only way the plaintiff can prevail under the facts and circumstances in the instant case is to prove by a preponderance of the evidence that the transformer was defective and did not have a proper fuse. The plaintiff relies upon the doctrine of *res ipsa loquitur* in this Court in order to assist him with the burden of proof to show the defendant was guilty of negligence in not having a proper fuse in the transformer, thus shifting the burden of going forward on the defendant to show that there was a proper fuse in the transformer and that it was blown at the time it was short circuited, cutting off the power to the plaintiff's building and others served from the same transformer. The doctrine of *res ipsa loquitur* may be relied on where specific acts of negligence are alleged in a declaration if sufficient facts are also alleged in a declaration for the application of such

doctrine. The declaration in the instant case alleges only specific acts of negligence and there is no allegation in the declaration with regard to the application of the doctrine of *res ipsa loquitur*. Therefore, such doctrine cannot be relied upon in this case. *Mullins v. Baker, et al.* 144 W. Va. 92, 97, 107 S. E. 2d 57; *Pope, infant v. Edward M. Rude Carrier Corp.*, 138 W. Va. 218, 234, 75 S. E. 2d 584. Even if the doctrine of *res ipsa loquitur* was applicable in this case, the facts clearly show that the defendant has come forward with sufficient evidence to rebut any inference that there was not a proper fuse contained in the transformer at the time of the short circuit and to show that the fire could therefore not have been caused by the messenger cable falling on its service lines to the plaintiff's building regardless of whether they were insulated or not. Three witnesses for the defendant testified that the fuse in the transformer blew which would cut off the power and block its flow to the plaintiff's building and other buildings serviced by the same transformer. One witness for the defendant testified that he had examined the transformer after the fire and found that it functioned properly and that the fuse had blown. The plaintiff, therefore, did not prove by a preponderance of the evidence that the defendant was guilty of any negligence which proximately contributed to the fire. *Wickline v. Monongahela Power Co.*, 139 W. Va. 732, 81 S. E. 2d 326; *Barnett v. Virginia Public Service Co.*, 169 Va. 329, 193 S. E. 538.

The evidence of the defendant showed also that at the time the pole fell allowing the messenger cable to come in contact with the service wires, the lights went out in the building owned by Ray Jones, which building was serviced by the same transformer. Also, no electrical equipment was damaged in his store, although it is true that if the motors were not in operation at the time it is possible that they may not have been destroyed by excess voltage. However, with the evidence that the lights went off, it would indicate that the fuse in the transformer was working properly

and blew at the time of the short circuit. In the case of *Ramsey v. Carolina-Tennessee Power Co.*, 195 N.C. 788, 143 S. E. 861, the fact that electrical disturbances were created in adjacent premises served by the same transformer was considered as proof that the fuse in the transformer did not function properly; the converse should be true in the case at bar.

The defendant offered in evidence the same transformer that was on the pole at the time the fire occurred but the trial court refused to allow it to be introduced in evidence as the same transformer because of the failure on the part of the defendant to prove the complete chain of possession relative to the transformer. This transformer was removed from the pole on the morning of the fire by an employee of the defendant. It was taken to Sutton, West Virginia, and delivered to another employee of the defendant who took the serial number off the transformer and sent it to another employee of the defendant in Webster Springs, West Virginia. The defendant failed to show who took the transformer to Webster Springs and for this reason the court sustained the objection of the plaintiff to its admission in evidence. The employee of the defendant in Webster Springs identified the transformer as being the identical transformer delivered to him from Sutton by its serial number and the only difference in its condition was scraped paint where the bolts were taken off to remove the lid in order to inspect it. It is sufficient in order for it to be introduced in evidence that such object be satisfactorily identified as being in substantially the same condition as at the time of the fire. 32 C.J.S., Evidence, §607; *Lestico v. Kuehner,* 204 Minn. 125, 283 N. W. 122. It was held in the Lestico case that there was never such a rule as chain of possession, that it was utterly immaterial how many hands or whose hands the object had been in so long as it could be identified; that if the changes destroyed the identity of the object or made the object wholly worthless or of questionable value in evidence, a different situation would be pre-

sented. It was held in the case of *Smith v. Middlesboro Electric Co.*, 164 Ky. 46, 174 S. W. 773, 54 A.L.R. 2d 923, that the fact that a test of the transformer was made months after the acts in question did not render the evidence as a result of such test inadmissible if the transformer was in the same condition at the time of the test as it was at the time of the accident. This question is discussed in 32 C.J.S., Evidence, §607, in the following language:

> "In order that an article may be so introduced it must be satisfactorily identified, and it must also be shown to the satisfaction of the court that no such substantial change in the article exhibited as to render the evidence misleading has taken place. However, it is not necessary that the article be identically the same as at the time in controversy. It is unnecessary to show an absence of tampering on the part of every person through whose hands the article has passed; as long as the article can be identified it is immaterial in how many or in whose hands it has been. A direct statement that the article was in the same condition at the time of an occurrence as at a subsequent time is not required if it sufficiently appears that it must have been in substantially the same condition."

The Law of Evidence, Virginia and West Virginia, (Michie), §115, states: ''Any object which has a relevant connection with the case is admissible in evidence, in both civil and criminal trials.

\*    \*    \*    \*

''In both civil and criminal cases for the object to be admissible in evidence the exhibit must be identified.''

We are therefore of the opinion that it was reversible error for the trial court to refuse to allow the transformer in substantially the same condition identified as the same transformer attached to the pole at the time of the fire to be introduced into evidence in this case.

The objections by the defendant to the instructions given and refused by the court are mainly based on the duty or care owed by the defendant power com-

pany in such cases, and for this reason they will be discussed together.

The test with regard to this duty is whether the appliance is one customarily used by the industry and has proved satisfactory for the purpose intended, and this duty is discharged by the employment of the customary and approved devices and methods of construction, or insulation. *Frye v. McCrory Stores Corporation*, 144 W. Va. 123, 107 S. E. 2d 378. Pt. 1 of the syllabus of *Maggard v. Appalachian Electric Power Company*, 111 W. Va. 470, 163 S. E. 27, properly enunciates this duty which was reaffirmed by the latest case dealing with this subject, *Frye v. McCrory Stores Corporation, supra,* in which it was held:

> "Those who operate and maintain wires charged with dangerous voltage of electricity are required to exercise a degree of care commensurate with the dangers to be reasonably apprehended therefrom; but they are not insurers against all injury therefrom."

Instructions that tell the jury that defendant must exercise the highest degree of care do not properly state the care required in such cases. It is ordinary care in attendant circumstances. *Overton v. Fields,* 145 W. Va. 797, 117 S. E. 2d 598, 608.

The defendant complains that it was error for the trial court not to instruct the jury in several instructions that the standard of care required of the defendant was that provided by the National Safety Code and that if the Code was complied with the defendant would not be guilty of negligence. It is true that if the defendant did not comply with said Code it would be guilty of *prima facie* negligence. *McKinney v. Appalachian Electric Power Company,* 261 F. 2d 292. However, a power company may be negligent even though it complied with the National Safety Code if the plaintiff can show something more ought to have been prudently done. This is a question usually to be determined by the jury under proper instructions by the court with the facts and circumstances applicable thereto contained in such instructions. In the case at

bar, when the messenger wire was originally placed over the service wires of the defendant it complied with the National Safety Code, but when the pole supporting the messenger cable became unsafe and the parties had knowledge of this fact and did nothing about it, negligence could be present, even though the National Safety Code was complied with originally. The service wires leading to the plaintiff's building were located and placed at such distance as to satisfy the requirements of the National Safety Code, and where the insulation of such wires is immaterial, as shown in this case, there would be no actionable negligence in this instance, and the jury should have been so instructed if properly requested. *Wickline v. Monongahela Power Co., supra.* The instructions given and refused that did not contain the care and duty set out above would be erroneous.

For the reasons set out herein, the judgment of the Circuit Court of Gilmer County is reversed, the verdict of the jury is set aside and the defendant is awarded a new trial.

*Judgment reversed;
verdict set aside;
new trial awarded.*