DAVIDSON'S, INC., *etc.*, DOROTHY ELDERMAN, *etc.*, FLOYD E. WALKER, *et al., etc.*, ROGERS & COMPANY, INC., *etc.*, JACK CUTTLER, *et al., etc.*, GEORGE F. MILLER, *et al.*, TEEN SHOPS, INC., *etc.*, AND NATIONAL FIRE INSURANCE COMPANY OF HARTFORD, CONNECTICUT, *et al.*

*v.*

LEONARD SCOTT, *et al.*, AND HOUSEHOLD FINANCE CORPORATION, *etc.*

(No. 12332)

Submitted January 19, 1965.     Decided March 16, 1965.

*Jenkins & Jenkins, Norman K. Fenstermaker,* for appellants.

*R. R. Fredeking,* for Scott & Air Conditioning.

*Huddleston & Bolen, Edwin W. Conley,* for Household Finance Corp.

BERRY, JUDGE:

This case involves eight separate actions which were instituted in the Circuit Court of Cabell County, West Virginia by Davidson's Inc., doing business as Davidson's Record Shop; Dorothy Elderman, Executrix of the Estate of J. I. Elderman; Floyd E. Walker and George W. Bailey as Trustees under the will of Sadie E. Bailey, and Floyd E. Walker, in his own right, doing business as Bailey's Cafeteria; Rogers & Company, Inc., a Corporation; Jack Cuttler and Rae Jaffe, doing business as Milady Shop; George F. Miller, et al.,; Teen Shops, Inc., doing business as Deb Fashions; and National Fire Insurance Company of Hartford, Connecticut, et al., against Leonard Scott, Air Conditioning Corporation, a West Virginia Corporation, and Household Finance Corporation, a Delaware Corporation, to recover damages as a result of a fire allegedly caused by the negligence of the defendants. All of the actions were consolidated and tried together as one action in the trial court. The issue was limited by a pretrial order to the question of liability only and at the conclusion of the plaintiffs' evidence the trial court sustained the motions of the defendants for a directed verdict and entered judgments thereon in favor of the defendants to which the plaintiffs objected and made timely motions to set aside said directed verdicts and the judgments entered thereon and to grant the plaintiffs new trials which were overruled by the trial court.

An appeal was granted on May 4, 1964 by this Court to the final judgment of the trial court and the consolidated

actions were submitted for decision on arguments and briefs at the January, 1965 Term.

The plaintiffs, with the exception of the National Fire Insurance Company of Hartford, Connecticut, are the owners and operators of business establishments and buildings, either in the J. L. Caldwell building located on the corner of Fourth Avenue and Ninth Street in the City of Huntington, Cabell County, or owners or operators of adjoining buildings or businesses. The plaintiff, the National Fire Insurance Company is a subrogee of the owners of the J. L. Caldwell building. It appears that all of the parties involved in these actions, with the exception of the Household Finance Corporation, were insured by some 38 insurance companies and that they have been reimbursed for the damages sustained by the fire in question and under the subrogation agreements the actions could either be brought in the name of the insured or the insurer. The defendants made a motion under Rule 17, R.C.P. to have the insurance companies made parties plaintiff on the ground that they were the real parties in interest. Although the motion was overruled, the trial court indicated that it would allow the insurance companies' names to be disclosed.

The defendant Air Condition Corporation is a West Virginia corporation with its place of business located in Huntington, West Virginia, and was engaged in the business of installing and servicing air conditioners and furnaces. The defendant Leonard Scott was an employee of said corporation. The defendant Household Finance Corporation is a Delaware corporation and at the time the fire in question occurred it operated a place of business on the second floor of the J. L. Caldwell building in Huntington under a lease from J. L. Caldwell and Company and another person. The premises leased by the Household Finance Corporation consisted of an office, two restrooms and a utility room which were across the hallway from the office. The utility room was used as a furnace room and had two furnaces and two air conditioning units as well as a hot water heater in said room. One of the air conditioning units and furnace

was for heating space in the J. L. Caldwell building which was not rented and it was not in operation at the time of the fire. The other furnace and air conditioning unit was used by the Household Finance Corporation. The furnace was a Carrier gas furnace which was anchored to the ceiling with the air conditioning unit underneath it. The same ducts were used for both the cooling and heating system and the fan for conveying the air through the ducts was in the air conditioning unit. The Household Finance Corporation's lease required the lessor to install adequate heating and air conditioning units and required the lessee to keep said units in good repair.

In December, 1959, or January, 1960, a new furnace was installed to service the Household Finance Corporation's leased premises by the defendant Leonard Scott and the Air Conditioning corporation. About April 1, 1960, the weather having become quite warm, the defendant Scott and the Air Conditioning Corporation was requested by the defendant Household Finance Corporation to convert from winter heat to summer air conditioning which was done. At the time of the conversion, a baffle was placed in the furnace so that the air from the air conditioning unit fan would not come through the furnace but would go around it, this having been done in order to avoid any dampness. The gas valve to the furnace burners was cut off but the main gas valve was left open as well as the valve to the pilot light in the furnace. The pilot light was left burning for the purpose of avoiding the accumulation of dampness in the furnace, and, of course, the main valve preceding the pilot valve and burner valve had to remain open to allow gas to reach the pilot light. The lever on the combination thermostat was set from heat to air conditioning and the temperature control was run back to 55 degrees and left there.

There were several keys to the utility room in which the furnace and air conditioning units were located. One key was kept in the office of the Household Finance Corporation on a hook for the use of the janitor and employees of the Household Finance Corporation. Apparently there

was another key in the possession of the manager of the Household Finance Corporation. Employees used the key to turn the fan in the air conditioning unit from automatic to continuous in order to get adequate air in the office space and to cut it back to automatic at the end of the work day which would only require the fan to run periodically. The janitor used the key to clean the utility room and he testified that he was in the utility room either Saturday night or Sunday morning of April 10th or 11th, 1960, and apparently he did not observe anything unusual about the furnace in question. The fire was reported to the Huntington fire department at 4:08 a.m. April 11, 1960. Other keys to the utility room were in the possession of the lessor. One of the keys was kept in the office of the J. L. Caldwell Company and the other in the possession of a Mr. Turner, an employee of said company. These keys were used to allow prospective tenants for the unrented portion of the J. L. Caldwell building to be shown the utility room and to allow workers to go upon the roof of said J. L. Caldwell building in order to make repairs and any other work necessary in connection with the ownership thereof, the only entrance to the roof from the inside of the building being through a window in the utility room.

When the Huntington fire department arrived at the scene of the reported fire, smoke was observed coming from the basement of the Bailey Cafeteria but no fire was visible. Upon entering the basement of the Bailey Cafeteria it was ascertained that the smoke was being forced through the ducts from some other place in the building. The deputy fire chiefs stationed themselves on the top of a building where they could observe the entire area and they then ascertained that fire broke out on the roof near the utility room in the J. L. Caldwell building leased to the Household Finance Corporation heretofore referred to.

Some eight months before the fire in question occurred, another fire occurred in this same building in the space rented and occupied by the Rogers Jewelry Company. It was determined that it was caused by defective electrical wiring. The damage done by the fire of April 11, 1960,

to the equipment located in the Rogers portion of the J. L. Caldwell building was much greater than the damage to the equipment in the other part of the building leased by the Household Finance Corporation. Deputy fire chief Claude L. Nelson testified in behalf of the plaintiffs that he saw the fire break out near the elevator shaft of the Rogers Jewelry Company and that he had no idea how the fire started, that it could have started in different ways and that it was difficult to tell how a fire started. Russell Saunders, another deputy fire chief, testified that he thought the furnace in the utility room leased by the Household Finance Corporation started the fire but that he did not know whether it did or not and that he made no examination of the furnace or its controls, and conceded that it could have started any place. Burlen W. Ellis, Captain in the Bureau of Fire Prevention of the Huntington Fire Department, testified that he thought the fire started in the furnace in the utility room leased by the Household Finance Corporation because the wood in the ceiling was charred more in that room, that he could not tell definitely how it started.

Alfred Ellis Baccini, a consulting engineer, testified in behalf of the plaintiffs. He was employed by the insurance companies to investigate this fire. He arrived in Huntington 14 days after the fire and proceeded to make an investigation of the burned building and the damaged equipment in it. Although the main gas valve which supplied gas to the Carrier furnace in the utility room of the Household Finance Corporation was off when he conducted his investigation, he concluded it was on at the time of the fire because of a certain brightness he noticed about the valve stem when he inspected it, indicating that the portion of the stem which was protected while on had not been discolored by the fire. The manual shut-off valve to the Carrier furnace was on at the time he conducted his investigation and he stated it was "frozen" in that position, indicating it had been on during the fire. He stated that the combustion chamber of the Carrier furnace had undergone severe heat; that the combination thermostat was set for 72 degrees and the lever turned to heat at the time of his

investigation. He found the baffle in place which kept the air from entering the furnace and he testified that it was his opinion that with the combination thermostat set for heat at 72 degrees and with the baffle in place the furnace kept heating without allowing the hot air to go through the ducts and when it reached a high degree of around 392 degrees it set fire to the wood overhead. He further testified that furnaces of this type had "limit controls" on them and they were usually set for 250 degrees fahrenheit, but that such controls were not responsive to radiant heat which was the type of heat produced by the furnace in question with the baffle installed and that they were responsive to heated air flowing over them, which would mean that the furnace in question was not in normal use because the limit control was not sensitive to radiant heat and "took longer for it to act" with such heat, thus allowing the furnace to heat to a high degree before the limit control would cut it off. He testified in effect that the top of the furnace or combustion chamber should not be within 36 inches of the ceiling or combustible material, and although the furnace had fallen and the roof burned as a result of the fire he indicated that the furnace was suspended within 6 inches of the ceiling. His testimony on this point is not clear because in other places he testified that there was no ceiling. This witness' testimony was to the effect that the fire originated in the utility room of the Household Finance Corporation by virtue of the combustion chamber being overheated in the Carrier furnace and setting fire to the adjacent wood or material, all of which was caused by the improper use of the unit at that time. This witness had originally stated before he viewed the premises that the fire was caused because the furnace had not been properly converted from winter to summer use, but later changed his opinion after coming to Huntington and being given additional information with regard to the change-over having been made some week or so before the fire. The testimony of this witness during the trial of this case in the circuit court, which is different in many respects from that given in his deposition, is to the effect that the fire was caused by an abnormal use of

the combination heating and cooling units, it having been used as a heating unit after it had been changed for use as a cooling unit.

The complaints filed by the plaintiffs, all of which contained practically the same allegations with regard to negligence, allege that: (1) The negligence consisted of the improper manner in which the furnace was converted from winter to summer use; or in the alternative, (2) that defendants negligently installed, maintained, converted, operated and lighted said furnace and air conditioning equipment, the installation and maintenance being in violation of the Code of the City of Huntington and the laws of West Virginia; (3) there was a violation of the provisions of the lease between the Household Finance Corporation and the J. L. Caldwell Company wherein it was provided that: "Lessee will keep the heating and air conditioning unit in good order and repair, and hereby assumes the entire responsibility for the same from and after the installation thereof and the acceptance by Lessee of possession of the demised premises." The allegations pertaining to the violation of the City Code of Huntington and the laws of West Virginia relate likewise to negligence on the part of the defendants. Code, 36-4-13, and the Code of the City of Huntington, Part III, Chapter 12, Article XV, Section 12-154.

The pretrial order limited the issues upon which the trial should be conducted to: 1. The question of joint or several negligence of the defendants and whether any such negligence was the proximate cause of the damages, (a) in the matter of the installation of the Carrier furnace in the utility room of the premises leased by the Household Finance Corporation, (b) in the conversion of said furnace from winter to summer use, and, (c) in the maintenance and operation of said furnace; 2. whether there was negligence of the plaintiffs that contributed to any damages; and 3. whether any risk was assumed by the plaintiffs in connection with this damage. This pretrial order was later amended by stipulation of counsel to eliminate the conversion from winter to summer use as an issue. It should

be noted that after examination and entry the order reciting the action taken during the pretrial conference and any stipulations or admissions by the parties relative thereto limits the issues for trial to those not disposed of by the attorneys and controls the subsequent course of action in connection therewith unless modified at the trial. Rule 16, R.C.P.

The only issues to be considered in this case by virtue of the pretrial order and modification thereof are whether the defendants negligently installed, maintained and operated the furnace and air conditioning units in question and whether the plaintiffs were guilty of any negligence that contributed to the damage sustained as a result of the fire.

The lease in question was between the J. L. Caldwell Company and the Household Finance Corporation and the conditions or breach thereof, if any, would not be available to the other plaintiffs who were not parties to the lease. Code, 55-8-12, *United Dispatch* v. *Albrecht Co.,* 135 W. Va. 34, 62 S. E. 2d 289. Then too, the lease in question requires the lessor, J. L. Caldwell Company, to install the furnace and then requires the lessee to keep it in good order and repair and assume the responsibility for it after the installation thereof. Code, 36-4-13, relating to such matter does not make the lessee liable for damage caused by fire under such a provision as in the lease in question except for negligence of the lessee. *McKenzie et al.* v. *The Western Greenbrier Bank,* 146 W. Va. 971, 124 S. E. 2d 234. The J. L. Caldwell Company inspected the furnace after it was installed in December, 1959, or January, 1960, and approved the installation. It is perfectly clear from the plaintiffs' briefs that they were and are principally interested in holding the defendant Household Finance Corporation responsible for the damage caused by the fire in question. This is obvious by the statement on page 9 of plaintiffs' brief wherein it is stated, after the motions were made by both defendants for a directed verdict in their favor: "The motions were opposed by the plaintiffs, principally the motion of Household Finance Corporation."

On page 17 of the plaintiffs' brief the statement is made that: "Plaintiffs presented testimony which proved that when the furnace was turned off, and the air conditioner turned on, on or about April 1, 1960, that it was done in a proper manner by Leonard Scott." It should also be pointed out that the installation of the Carrier furnace was done by Leonard Scott and the Air Conditioning Corporation in December, 1959, or January, 1960, and all of the complaints of the plaintiffs filed in the actions in this suit relate to an installation and conversion on or about April 8, 1960, and not to the installation of the furnace some three or four months before. The assignments of error relied on by the plaintiffs in their brief clearly indicate that the errors complained of only relate to the Household Finance Corporation. See *Montgomery v. Montgomery,* 147 W. Va. 449, 128 S. E. 2d 480.

It would therefore appear that the only question before us in this case is whether the defendant Household Finance Corporation, its agents or employees, were guilty of some negligent act which caused the fire on April 11, 1960. Although the complaints contained allegations of approximately $700,000.00 damages to the plaintiffs' property as a result of the alleged negligence of the defendants, the exact amount thereof is not involved in this appeal.

It is the theory of the plaintiffs that an agent or employee of the Household Finance Corporation opened the gas valve to the furnace, moved the lever from air conditioning to heat on the combination thermostat and set it for 72 degrees, and in so doing caused the furnace to start and heat the air in it; that the hot air could not be forced through the ducts because of the defendant Leonard Scott's having placed a baffle in the furnace when it was converted from winter to summer use; and that the hot air which thus accumulated without any circulation raised the temperature in the furnace and later in the upper part of the utility room above the combustion point of wood and set fire to the Caldwell building.

There is no direct proof whatsoever in this record that any agent or employee of the Household Finance Corpo-

ration did any tampering with the furnace controls. In fact, there is evidence and an inference to the contrary. The manager of the Household Finance Corporation stated that he did not do it. The janitor who was in the utility room not long before the fire started and apparently noticed nothing unusual stated that he did not do it. None of the other employees of the Household Finance Corporation were called to testify at the trial in connection with this matter. It can therefore be inferred that their testimony would be adverse. *Rohrbaugh* v. *Rohrbaugh,* 136 W. Va. 708, 68 S. E. 2d 361. In fact, it is indicated that these employees deny doing so in depositions taken before the trial. However, assuming there is no direct proof, it is the further contention of the plaintiffs that an inference can be drawn that an agent or employee of the Household Finance Corporation changed the controls because of the facts proved, among which were the fact that after Scott converted the units from winter to summer operation it became quite cold in the vicinity of Huntington, getting below freezing, and the fact that the thermostat was turned up to 72 degrees with the lever in position of heat and the fact that the gas valve to the furnace was found turned on, all of which would indicate that some one tampered with the units in an effort to get heat after they were converted from winter to summer operation. Of course, under plaintiffs' theory, the Household employees would have the urgent reason of working in a cold office to induce tampering.

It might be well to state here that if Scott had not placed the baffle in the furnace it could readily have been converted back from summer operation to winter heat because the unit was a combination unit, and the air would have been forced or conveyed through the furnace instead of around it. Then, too, after the baffle was placed in the furnace by Scott, it would not allow the furnace to be used properly if the combination unit was again set in some manner for heating purposes, but if the electric wiring controlling the automatic use of gas for heating purposes had been disconnected it would then have been impossible for the furnace to become overheated as claimed by the plaintiffs. It would have been a safety factor to

compensate for the use of a baffle in the furnace at the time of the conversion in case an attempt was made to use the combination unit for heating purposes after such conversion. It should also be pointed out that the very purpose of a limit control on this particular furnace or any other furnace is to alleviate the possibility of the furnace heating to such a high degree that it could set fire to material in or around where it was located. A limit control is a safety factor which if properly placed on a furnace will automatically shut down the heating plant in the event the bonnet temperature or the temperature on top of the furnace rises to an unsafe high degree, regardless of the cause. Therefore, if the limit control was properly placed on top of the furnace it would make no difference what type of heat came from the top of the furnace, because when it reached a certain degree it would automatically shut off the heating plant and no fire would result from the overheating of the furnace. Such controls are usually set for 250 degrees cut off, according to Bacinni.

It is difficult to understand why the limit control on this furnace would not function regardless of its type if it was placed near the top of the furnace because heat should radiate or be convected and come in contact with and activate the limit control regardless of the kind of heat before material above the furnace reached 392 degrees fahrenheit. The limit control or safety device which was attached to the furnace should deactivate it before material located near the furnace is set on fire.

The plaintiffs' evidence indicated that the fire in question could have been caused in numerous ways and in several places and is not positive as to its origin. This, of course, because of the conflict in the evidence relating thereto, would be a question for jury determination as to what caused the fire. However, inasmuch as a verdict was directed in favor of the defendant Household Finance Corporation, the evidence must be looked upon most favorably for the plaintiffs and considering the evidence of the plaintiffs in this light we think it can be assumed that the fire started in the utility room of the premises leased by the

Household Finance Corporation as a result of the overheating of its furnace located therein. *Thornsbury* v. *Thornsbury,* 147 W. Va. 771, 131 S. E. 2d 713; *Lambert* v. *Goodman,* 147 W. Va. 513, 129 S. E. 2d 138; *Perry* v. *Scott,* 134 W. Va. 380, 59 S. E. 2d 652.

The mere fact that the fire started in the utility room of the Household Finance Corporation by the overheating of its furnace does not establish negligence on its part in connection therewith. Even if it was proved that an agent or an employee of the Household Finance Corporation attempted to use the combination heating and cooling units in their office for heating purposes after Scott had converted it from winter to summer use, it could not be foreseen that such act on their part would cause a fire.

It was held in point 6 of the syllabus in the case of *Puffer* v. *Hub Cigar Store,* 140 W. Va. 327, 84 S. E. 2d 145, that: "A person is not liable for damages which result from an event which was not expected and could not reasonably have been anticipated by an ordinarily prudent person." If the baffle had not been placed in the furnace it could not have overheated and in any event it would only be reasonable for anyone doing such an act to assume that a proper limit control or safety factor had been placed on the heating unit or furnace which would automatically cut off the heat or shut down the heating plant in case the temperature of the furnace reached an unnecessarily or unsafe high degree. If an ordinarily prudent person could not reasonably foresee that an attempt to obtain heat from a combination heating and cooling unit might naturally or probably result in causing a fire that would damage the plaintiff's property no actionable negligence would be present and no recovery could be had. 13 M. J., Negligence, §22; *Pope* v. *Edward M. Rude Carrier Corp.,* 138 W. Va. 218, 75 S. E. 2d 584; *State ex rel. Cox* v. *Sims,* 138 W. Va. 482, 77 S. E. 2d 151; *Wilson* v. *Edwards,* 138 W. Va. 613, 77 S. E. 2d 164; *Matthews* v. *Cumberland & Allegheny Gas Co.,* 138 W. Va. 639, 77 S. E. 2d 180; *Hartley* v. *Crede,* 140 W. Va. 133, 82 S. E. 2d 672; *Puffer* v. *Hub Cigar Store,* 140 W. Va. 327, 84 S. E. 2d 145. This principle is succinctly

stated in *Osborne* v. *Atlantic Ice and Coal Co.,* 207 N. C. 545, 177 S. E. 796, cited in both cases of *Wilson* v. *Edwards, supra,* and *Puffer* v. *Hub Cigar Store, supra,* as follows: "The law only requires reasonable foresight, and when the injury complained of is not reasonably foreseeable, in the exercise of due care, the party whose conduct is under investigation is not answerable therefor. Foreseeable injury is a requisite of proximate cause, and proximate cause is a requisite for actionable negligence, and actionable negligence is a requisite for recovery in an action for personal injury negligently inflicted."

The evidence in this case is not only not positive but it is speculative in many instances. The fact that the master gas valve was closed when the plaintiffs' witness Bacinni investigated the fire and his testimony two weeks after the fire that the valve was open during the fire would indicate that someone had turned the valve after the fire occurred and if this is true other controls could have been turned after or during the fire. Much emphasis is placed on the fact that when Scott converted the combination unit from winter to summer heat he placed the temperature control at 55 degrees and when Bacinni saw it two weeks later it was set at 72 degrees. Not only could this thermostat have been turned up after or during the fire but logically it would have been turned up after the summer air conditioning was placed into use because it controlled the temperature and 55 degrees would be too cold even in the summertime. Doubtless, it was turned up after it began working as a cooling unit. Then, too, the furnace would have overheated with the thermostat set at 55 degrees the same as it would if set at 72 degrees if it was colder than 55 degrees in the room where the thermostat was located and no heat was being conveyed through the ducts. The lease between the J. L. Caldwell Company and the Household Finance Corporation provided for the lessor to furnish a cooling unit to provide a temperature of 80 degrees in the summertime inside when it was 98 degrees on the outside.

The plaintiffs attempted to prove specific acts of negligence in which they were unsuccessful, and also relied on

the doctrine of *res ipsa loquitur*, which is inconsistent. See *Frye* v. *McCrory Stores Corporation*, 144 W. Va. 123, 107 S. E. 2d 378; *Pope* v. *Edward M. Rude Carrier Corp., supra.* In any event, the doctrine of *res ipsa loquitur* is not applicable in the case at bar, assuming that the fire was caused by the furnace in the utility room leased by the defendant Household Finance Corporation as a result of negligence on the part of someone who entered the utility room, because the evidence clearly indicates that the Household Finance Corporation did not have exclusive control over the utility room in which the furnace was located, nor was there lack of opportunity by others to tamper with the furnace. The J. L. Caldwell Company and its agent also had keys and it was shown that persons other than the agent or employees of the Household Finance Corporation entered this utility room on many occasions. In such cases the doctrine of *res ipsa loquitur* is not applicable. 65 C. J. S., Negligence, Sections 220 (8) and 220 (12); *Pope* v. *Edward M. Rude Carrier Corporation, supra; Redman* v. *Community Hotel Corp.,* 138 W. Va. 456, 76 S. E. 2d 759; *Mullins* v. *Baker,* 144 W. Va. 92, 107 S. E. 2d 57; *Johnson* v. *Monongahela Power Company,* 146 W. Va. 900, 123 S. E. 2d 81.

The reason for the inapplicability of the doctrine of *res ipsa loquitur* in this case is clearly set out in the case of *Oates* v. *Continental Insurance Company,* 137 W. Va. 501, 72 S. E. 2d 886, wherein this Court held that even though the plaintiff had placed new locks on her house and had the only key that would open the doors, this did not preclude the possibility of some other person obtaining entrance to the house and opening the oil valve and setting fire to the house. In the case at bar the evidence clearly shows that other persons had keys to the utility room besides agents and employees of the Household Finance Corporation and for that reason the doctrine of res ipsa loquitur would not be applicable in any event for the use of an inference to establish *prima facie* negligence against the Household Finance Corporation.

For the reasons enunciated herein, the judgment of the Circuit Court of Cabell County is affirmed.

*Affirmed.*